STATE OF NORTH CAROLINA v. MICHAEL McGAY REEVES

No. 193A92

(Filed 6 October 1994)

1. **Criminal Law § 478 (NCI4th)— first-degree murder—sentencing hearing—judge's communication with jury foreperson—continuance of deliberations—food for jury—absence of other jurors**

   There was no prejudicial error in a first-degree murder sentencing hearing where the foreperson returned to the courtroom late in the day after deliberations had begun and indicated that the jury would like to deliberate at least another hour and, when the judge indicated that dinner could be brought in, requested drinks and something light. There was no discussion of matters material to the case which the foreperson could have conveyed to the other members of the jury.

   **Am Jur 2d, Trial §§ 1562 et seq.**

   **Communication between court officials or attendants and jurors in criminal trial as ground for mistrial or reversal—post-*Parker* cases. 35 ALR4th 890.**

2. **Evidence and Witnesses § 2171, 290 (NCI4th)— first-degree murder—sentencing hearing—psychiatric expert—cross-examination—other offenses—basis for opinion**

   The trial court did not abuse its discretion in a sentencing hearing for first-degree murder by allowing the State to ask a psychiatrist questions on cross-examination which revealed rapes and assaults by defendant in Virginia and Tennessee. The witness testified that he had used the evidence of the Tennessee and Virginia crimes in forming his opinion as to defendant's condition, which made it relevant under N.C.G.S. § 8C-1, Rule 705. Whether evidence should be excluded under N.C.G.S. § 8C-1, Rule 403 as being more prejudicial than probative is within the discretion of the judge.

   **Am Jur 2d, Evidence §§ 404 et seq.; Expert and Opinion Evidence §§ 75 et seq.**

3. **Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing hearing—Virginia convictions and sentences—excluded as mitigating evidence**

The trial court did not err in a first-degree murder sentencing hearing by excluding from the evidence a certified copy of defendant's Virginia convictions and sentences and precluding his arguing that they were mitigating evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

4. **Evidence and Witnesses § 2899 (NCI4th)— first-degree murder—sentencing hearing—psychiatrist—defendant's adjustment in prison—cross-examination—escape attempt**

There was no error in a first-degree murder sentencing hearing where a psychiatrist who had examined defendant testified that defendant had functioned well for more than a year in jail and that with medication and treatment "would be safe" in a prison setting, and the State was allowed to ask the witness on cross-examination whether it would affect his opinion if he had heard that defendant had attempted to escape from prison in Virginia. Although N.C.G.S. § 8C-1, Rule 705 allows a party to elicit evidence of the underlying facts of a witness' opinion, it does not restrict a party from asking otherwise proper questions and there has been no suggestion that this question was not asked in good faith.

**Am Jur 2d, Witnesses §§ 484 et seq.**

5. **Indigent Persons § 19 NCI4th)— first-degree murder—sentencing hearing—appointment of psychiatrist with particular expertise—denied—no error**

The trial court did not err in a sentencing hearing for first-degree murder by refusing to appoint a psychiatrist with expertise in sexual disorders where defendant said at the hearing on his motion for the appointment of such a person that he would rely on his serious sexual disorder as a defense; he asked the court to appoint a particular psychiatrist from Johns Hopkins; the court asked if defendant had an alternate and defendant gave the court the name of a general forensic psychiatrist in Chapel Hill; the court appointed that psychiatrist; and defendant contends that the appointed psychiatrist did not provide the constitutionally required assistance. There is no showing in the record that a psychiatrist specializing in sexual problems could have

been any more explicit than the appointed psychiatrist, and the appointed psychiatrist testified that he had consulted with a PhD in psychology who specialized in sex problems, who was in the courtroom, and who would testify, and defendant decided not to call that witness, telling the jury that the appointed expert had covered everything.

**Am Jur 2d, Criminal Law § 1006.**

**Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19.**

6. **Criminal Law § 1067 (NCI4th)— first-degree murder —sentencing hearing—evidence of character of victim and impact on victim—no error**

There was no error in a first-degree murder sentencing hearing where a witness testified that the victim was a good wife and mother, a good person who always went to church and would do anything for anyone, and who died not knowing what happened to her two-and-a-half-year-old child. The testimony was not barred by the United States Constitution because it was not so prejudicial that it made the trial fundamentally unfair, it was not excludable under N.C.G.S. § 8C-1, Rule 402 because it was relevant to give the jury information as to all the circumstances of the crime, and N.C.G.S. § 8C-1, Rule 404 had no application because the evidence was not offered to show that the witness acted in conformity with the crime. While evidence of a victim's character may not by the strictest interpretation be relevant to any given issue, the State should be given some latitude in fleshing out the humanity of the victim so long as it does not go too far.

**Am Jur 2d, Criminal Law §§ 598, 599.**

7. **Evidence and Witnesses § 740 (NCI4th)— first-degree murder—sentencing hearing—victim's family members and friends—identified to jury—no error**

There was no plain error in a first-degree murder sentencing hearing where the district attorney identified to the jury several family members and friends of the victim.

**Am Jur 2d, Appeal and Error §§ 797-803.**

STATE v. REEVES

[337 N.C. 700 (1994)]

8. **Evidence and Witnesses §§ 2539, 2542 (NCI4th)— first-degree murder—sentencing hearing—testimony of victim's daughter—two-and-a-half years old at time of crime, five years old at time of sentencing—admissible**

There was no error in a first-degree murder sentencing hearing in the admission of the testimony of the victim's daughter, who was two-and-a-half years old at the time of the killing and five years old at the time of the hearing. There is no age below which one is incompetent as a matter of law to testify, and the court was able to see the witness and determine whether she could express herself. Although defendant contended that the child would be incompetent at five if she was incompetent at two-and-a-half, the child could remember what she had observed and be better able to articulate it when she was older.

**Am Jur 2d, Witnesses §§ 88 et seq.**

**Witnesses: child competency statutes. 60 ALR4th 369.**

9. **Evidence and Witnesses § 2540 (NCI4th)— first-degree murder—sentencing hearing—child witness—understanding of duty of witness to tell truth**

The trial court did not err in a first-degree murder sentencing hearing by admitting the testimony of the victim's two-and-a-half-year-old daughter, who was five at the time of the hearing, where the daughter testified in effect that a person could be punished for not telling the truth. While she did not answer on some occasions when asked about the difference between telling the truth and not telling the truth, the court could have found from all of the testimony that the child understood the duty of a witness to tell the truth.

**Am Jur 2d, Witnesses §§ 88 et seq.**

**Witnesses: child competency statutes. 60 ALR4th 369.**

10. **Evidence and Witnesses § 2538 (NCI4th)— five-year-old witness—testimony from stepmother's lap—no error**

There was no error in a first-degree murder sentencing hearing where the prosecutor requested that the victim's daughter, five years old at the time of the hearing, be allowed to testify while sitting on her stepmother's lap; the court warned the stepmother that she must not intimate in any way to the child how she should testify; and the court put in the record after the testimony

was complete that the stepmother had followed the court's instructions. Although a court should be cautious in allowing this procedure, this court had observed the witness and the Supreme Court could not say that the trial court was wrong in allowing a procedure which it felt would promote the ability of the witness to testify truthfully.

**Am Jur 2d, Witnesses §§ 88 et seq.**

**Propriety and prejudicial effect of third party accompanying or rendering support to witness during testimony. 82 ALR4th 1038.**

**11. Evidence and Witnesses § 542 (NCI4th)— first-degree murder—sentencing hearing—testimony of victim's daughter—relevant**

The trial court did not err in a first-degree murder sentencing hearing by admitting the testimony of the victim's five-year-old daughter, who was in another room of their home when the victim was killed. Although defendant contended that the testimony was not relevant under N.C.G.S. § 8C-1, Rule 401 because the only aggravating circumstance submitted was whether defendant had previously been convicted of a felony involving the use or threat of violence, the testimony as to the circumstances of the victim's death did "throw light" on the crime, which makes it relevant.

**Am Jur 2d, Homicide §§ 245 et seq., 578 et seq.**

**12. Evidence and Witnesses § 90 (NCI4th)— first-degree murder—sentencing hearing—testimony of victim's daughter while sitting in stepmother's lap—not more prejudicial than probative**

The trial court did not err in a first-degree murder sentencing hearing by not excluding as more prejudicial than probative testimony from the victim's five-year-old daughter delivered from her stepmother's lap. Although defendant contended that the testimony concerned only background matters and was only cumulative while the manner in which it was introduced was highly inflammatory, the Supreme Court paid deference to the ruling of the trial judge and could not say that he committed error in the admission of otherwise relevant testimony because of the manner in which the testimony was presented.

**Am Jur 2d, Evidence §§ 324 et seq.**

**13. Evidence and Witnesses § 931 (NCI4th)— first-degree murder—sentencing hearing—statement of victim's daughter—excited utterance**

The trial court did not err in a first-degree murder sentencing hearing by allowing the victim's mother-in-law to testify that on the morning of the murder she went to the victim's home, where the victim's two-and-a-half-year-old daughter came to the door and said, "Mama is asleep. Mama is dead." The statement by the daughter was made a few hours after the murder, she had been through a startling experience which suspended reflective thought, and her statement was a spontaneous reaction not resulting from fabrication. It was an excited utterance and was admissible as an exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(2).

**Am Jur 2d, Evidence § 865.**

**When is hearsay statement an "excited utterance" admissible under Rule 803(2) of the Federal Rules of Evidence. 48 ALR Fed 451.**

**14. Jury § 142 (NCI4th)— first-degree murder—sentencing hearing—jury selection—accountability to victim's family—not staking jury out**

There was no plain error in a first-degree murder sentencing hearing where the prosecutor asked questions during jury selection which defendant argued suggested that the jury was accountable to the victim's family and staked the jury out. It was not error to tell the jury it should be fair to the victim and her family; a jury should be fair to all persons interested in a case and it was proper to tell them so.

**Am Jur 2d, Jury §§ 201, 202.**

**15. Jury § 122 (NCI4th)— first-degree murder—sentencing hearing—jury selection—prosecutor's questions—defendant's intoxication—jury not staked out**

There was no plain error in jury selection in a first-degree murder sentencing hearing where the prosecutor asked several questions of the jury to the effect that, if they found the defendant had a diminished capacity because of the consumption of alcohol, would they consider before finding this mitigating circumstance that the defendant knew when he consumed alcohol that its use affected him. This was a proper question; the prose-

cutor did not attempt to stake the jury out as to what their answer would be on a hypothetical question.

**Am Jur 2d, Jury § 197.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**16. Jury § 123 (NCI4th)— first-degree murder—sentencing hearing—jury selection—prosecutor's questions—death penalty**

There was no plain error during jury selection in a first-degree murder sentencing hearing where the prosecutor asked on eleven occasions whether the jury would be willing to vote for death. Although the defendant contends that these questions contained inadequate and misleading statements of law, he reads the questions too narrowly. The death penalty procedures were explained in detail to the jury before and after the prosecuting attorney asked the disputed questions and an attorney cannot be expected to incorporate in every question all the qualifications which govern the death penalty. Although the questions had a tendency to stake the jurors out by asking how they would vote on a hypothetical situation, it was not error for the court not to have intervened *ex mero motu.*

**Am Jur 2d, Jury §§ 201, 202.**

**17. Jury § 147 (NCI4th)— first-degree murder—sentencing hearing—jury selection—prosecutor's statement—death penalty case—no error**

It was not error for the prosecutor to say during jury selection in a first-degree murder case that this was a death penalty case where defendant contended that this was an expression of the prosecutor's opinion, but this was, in fact, a death penalty case.

**Am Jur 2d, Jury §§ 201, 202.**

**18. Jury § 147 (NCI4th)— first-degree murder—sentencing hearing—jury selection—prosecutor's statement—death penalty or work release**

A misstatement by a prosecutor during jury selection for a first-degree murder prosecution was not so egregious that it required the court to intervene *ex mero motu* where the prosecu-

tor stated that "the twelve of you that sit on this jury will recommend either work release or [the] death sentence in this case," but immediately before and immediately after that statement told the prospective jurors they would be recommending either a life or a death sentence.

**Am Jur 2d, Jury §§ 201, 202.**

**19. Jury § 132 (NCI4th)— first-degree murder—sentencing hearing—jury selection—prosecutor's statement—absence of victim**

There was no error during jury selection for a first-degree murder sentencing hearing where the prosecutor asked whether the jury would be influenced by the victim not being there for them to see while the defendant was there. Although defendant argued that the prosecutor misled the jury by telling them that they could not consider the defendant's courtroom presence, appearance, and demeanor, the thrust of the argument was for the jury not to be unduly influenced by the absence of the deceased victim.

**Am Jur 2d, Jury §§ 201, 202.**

**20. Jury § 141 (NCI4th)— first-degree murder—sentencing— jury selection—questions concerning parole**

There was no error during jury selection for a first-degree murder sentencing hearing where the court denied defendant's motion to question jurors regarding their conceptions as to parole eligibility and, when two of the jurors asked about defendant's eligibility for parole, instructed them not to consider parole in their deliberations.

**Am Jur 2d, Jury §§ 201, 202.**

**21. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—comfortable prison life**

There was no plain error in a first-degree murder sentencing hearing where the prosecutor argued that defendant, if sentenced to life, would lead a comfortable life in prison. If the prosecutor used some hyperbole to describe life in prison, it was not so egregious as to require the court to intervene *ex mero motu*.

**Am Jur 2d, Trial §§ 554 et seq.**

**22. Criminal Law § 461 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—memory of victim's daughter—general knowledge**

There was no plain error in a first-degree murder sentencing hearing where the prosecutor argued that the victim's daughter, who was two-and-one-half years old and present in the home when the killing occurred, would probably begin to remember more of the events. Although defendant contended that there was nothing in the record to support the argument, the prosecutor was arguing what he considered to be general knowledge.

**Am Jur 2d, Trial §§ 609 et seq., 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**23. Criminal Law § 463 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—defendant's sexual disorder—supported by evidence**

There was no error in a first-degree murder sentencing hearing where the prosecutor argued that defendant's sexual disorder had not come up until he was in his twenties when he was caught in Virginia for abducting a park worker. Although defendant argued that all of the evidence showed that defendant's disorder was a long-standing problem, there was testimony that defendant's disorder was first revealed in a forensic evaluation when he was arrested in Virginia.

**Am Jur 2d, Trial §§ 554 et seq.**

**24. Criminal Law § 433 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—reference to defendant as predator**

There was no plain error in a first-degree murder sentencing hearing where the prosecutor referred to defendant as a predator.

**Am Jur 2d, Trial §§ 681, 682.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

**25. Criminal Law § 461 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—aggravating and mitigating circumstances**

There was no plain error in a first-degree murder sentencing hearing in the prosecutor's argument concerning balancing aggravating and mitigating circumstances where defendant contended that it was error for the prosecutor to argue that the jury could consider other factors than the aggravating and mitigating circumstances found in determining whether the aggravator outweighed the mitigating circumstances, but any error was not so egregious as to require the court to intervene *ex mero motu.*

**Am Jur 2d, Trial §§ 609 et seq.**

**26. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—previous convictions**

There was no plain error in a first-degree murder sentencing hearing where defendant contended that it was error for the prosecutor to argue prior rape and kidnapping convictions as reasons for imposing the death penalty when the court had ruled that these were not to be considered as substantive evidence but only as factors on which a medical expert based his opinion. The prosecuting attorney did not dwell on this part of his argument.

**Am Jur 2d, Trial §§ 609 et seq.**

**27. Criminal Law § 454 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—defendant's responsibility**

There was no plain error in a first-degree murder prosecution from the prosecutor's argument that defendant had written his own death warrant when he brutalized and killed the victim. Although defendant contended that the prosecutor was leading the jury to believe that the responsibility for the imposition of the death penalty lay elsewhere, the prosecutor argued that the defendant had brought the death penalty on himself and the jury should not have deduced that it was their responsibility to impose the death penalty.

**Am Jur 2d, Trial §§ 567 et seq.**

**28. Criminal Law § 1056 (NCI4th)— first-degree murder—sentencing hearing—allocution—greater distance from jury than attorneys**

There was no error in a first-degree murder sentencing hearing where defendant was allowed to address the jury, but the court moved the podium from before the jury box, where the attorneys made their arguments, to a place in front of the defendant's table. Although defendant says that the court showed the jurors that it thought defendant was an extremely dangerous individual who posed a risk to the jurors' safety, it was not an error for the court to make the distinction because defendant was not an attorney and his speech should not have been considered in the same light as the speeches of the attorneys.

Am Jur 2d, Criminal Law § 531.

**29. Criminal Law § 1338 (NCI4th)— first-degree murder—sentencing hearing—prosecutor's argument—elimination of witness—no plain error**

There was no plain error in a first-degree murder sentencing hearing where defendant contended that the prosecutor travelled outside the record to argue that the killing was done to eliminate a witness, but the prosecutor mentioned not leaving a witness or killing a witness and did not explicitly refer to witness elimination in the language of the aggravating circumstance.

Am Jur 2d, Criminal Law §§ 598, 599.

**30. Criminal Law §§ 1357, 1360 (NCI4th)— first-degree murder—sentencing hearing—mitigating circumstances not found—evidence not uncontradicted**

There was no error in a first-degree murder sentencing hearing where the jury did not find the mitigating circumstances that the murder was committed under the influence of mental or emotional disturbance or that defendant's capacity to appreciate the criminality of his conduct was impaired. Although defendant contends that a jury cannot refuse to find and consider a statutory mitigating circumstance which is supported by uncontradicted and credible evidence, the evidence in regard to these two mitigating circumstances was not uncontradicted.

Am Jur 2d, Criminal Law §§ 598, 599.

Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

**31. Criminal Law § 1323 (NCI4th)— first-degree murder—sentencing hearing—instructions—nonstatutory mitigating circumstances—mitigating value required**

The trial court did not err in a first-degree murder sentencing hearing by instructing the jury that they could refuse to find any nonstatutory mitigating circumstance which they found did not have mitigating value.

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

**32. Criminal Law § 1328 (NCI4th)— first-degree murder—sentencing—nonstatutory mitigating circumstances not found—no violation of Eighth Amendment**

There was no violation of the Eighth Amendment in a first-degree murder sentencing hearing where the jury failed to find five nonstatutory mitigating circumstances which defendant says were supported by uncontradicted and manifestly credible evidence and had mitigating value.

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

**33. Criminal Law § 1328 (NCI4th)— first-degree murder—sentencing—failure to find mitigating circumstances—influence of passion, prejudice, and arbitrary circumstances**

The Supreme Court did not find error in a first-degree murder sentencing hearing where defendant contended that the verdict was imposed under the influence of passion, prejudice, and arbitrary factors because the jury failed to find any mitigating circumstances, although defendant contended that the circumstances were supported by uncontradicted and manifestly credible evidence.

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

**34. Criminal Law § 1337 (NCI4th)— first-degree murder—sentencing—aggravating circumstance—prior felony involving violence**

The trial court did not err in a first-degree murder sentencing hearing by charging the jury that they could find the aggravating circumstance of a prior felony involving violence if they found that defendant had been convicted of second-degree rape and

assault with a deadly weapon inflicting serious injury. Although defendant contended that this instruction relieved the jury from proving every element of the offense in that second-degree rape does not always involve the threat or use of violence, the defendant had stipulated that the assault and rape had involved cutting the victim with a knife.

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

35. Criminal Law §§ 1357, 1360 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—mental or emotional disturbance—impaired capacity

The trial court did not err in a first-degree murder sentencing hearing in its instructions on impaired capacity and mental or emotional disturbance where defendant contended that the court limited the jury's consideration of disturbances and sources of impairment, but the court instructed the jury that they could consider "any other mental or emotional disturbance or personality disorder."

Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.

Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

36. Jury § 226 (NCI4th)— first-degree murder—sentencing hearing—opportunity to rehabilitate juror denied—no error

There was no error in a first-degree murder sentencing hearing where the trial court refused to allow defendant to rehabilitate a juror whom the State challenged for cause. There was no showing that further questioning by defendant would have produced a different answer from that given to the court.

Am Jur 2d, Jury §§ 289, 290.

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

**37. Jury § 262 (NCI4th)— first-degree murder—sentencing hearing—peremptory challenges—reservations about death penalty**

There was no error in a first-degree murder prosecution where the trial court allowed the State to use peremptory challenges to remove jurors who had expressed reservations about the death penalty but who could not have been challenged for cause.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**38. Criminal Law § 1373 (NCI4th)— first-degree murder—death penalty—not disproportionate**

A sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor, the record supports the finding of the aggravating circumstance on which the death penalty was based, and the sentence was not excessive or disproportionate where defendant entered the home of a person he did not know; ordered her to send her two-and-a-half-year-old child from the room; forced her to undress and sexually assaulted her using two different types of instruments, including one with a sharp edge capable of inflicting an incised wound found within her vagina; a bloody footprint and bloodstains on the soles of the victim's foot indicated she had stepped in blood at some point during the assault; the defendant placed a pillow over the victim's face, pressed the barrel of a pistol hard against the pillow and pulled the trigger; the victim died as the result of a single gunshot wound to the head; the terror of the victim can be imagined as she went through this torture, knowing all the while that her two-and-a-half-year-old child was in the home and subject to the brutality she was suffering; and the jury heard evidence that defendant had raped and assaulted a woman a few years previously and shortly after being released from prison had raped again, this time also brutally murdering his victim.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death by Phillips, J., at the 4 May 1992 criminal session of Superior Court, Carteret County, upon a jury verdict after the defendant had pled guilty to murder in the first degree. Heard in the Supreme Court 11 October 1993.

The defendant pled guilty to first-degree murder and no contest to first-degree sexual offense. He was tried by a jury to determine the punishment on the murder plea. The evidence showed the defendant went to the door of a house occupied by Susan Toler and her husband. Mrs. Toler was at home with her two-and-a-half-year-old daughter at that time.

The defendant forced his way into the home and ordered Mrs. Toler to send her child to another room, which she did. The defendant then forced Mrs. Toler to undress and sexually assaulted her. The defendant used at least two sharp tools to assault Mrs. Toler and she suffered five wounds in her vaginal area. The defendant then forced her to lie on the floor at which time he put a pillow over her head and shot her to death.

The jury found one aggravating circumstance. Three statutory and fifteen nonstatutory mitigating circumstances were submitted to the jury and none of the jurors found any of them. The jury recommended a death penalty which was imposed.

The defendant appealed.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, and Rudolph A. Ashton, III, for defendant-appellant.*

WEBB, Justice.

[1] The defendant first assigns error to what he contends was an improper communication by the court with the foreman of the jury out of the presence of the other jurors. After the jury had been deliberating for approximately two hours, the judge had them returned to the courtroom at 5:10 p.m. He asked the jury if they would like to break for the evening or whether they wanted to continue their deliberation. At the request of the jury, the judge allowed the jury to return to the jury room to decide whether they wanted to continue deliber-

ating. The judge told the jury at that time that he would have dinner brought to the jury room for them if they wanted him to do so. The jury then retired. The foreman returned to the courtroom and the following colloquy occurred:

THE COURT: Yes, sir.

JUROR HOOKER: Your Honor, we would like to have at least another hour or so maybe.

THE COURT: We are here at your pleasure. You remain as long as you like and let us know if at any time you would like to take a recess or take a break. If you would like us to order dinner for you for the evening, simply let us know that. Whenever you want us to furnish that for you, it will take about a half hour, 45 minutes.

JUROR HOOKER: They said maybe some drinks and some crackers, something light would be about it, I guess.

THE COURT: All right. We'll do that for you now.

[PROSECUTOR]: Judge, are you going to let them give her [the bailiff] a drink and cracker order? Perhaps if they will write it out. If anybody needs to make a phone call.

THE COURT: Just give them 6 Cokes and 6 Pepsis.

[PROSECUTOR]: Some people might want diet. Let her write it out. Can we then be back at ease, Judge?

THE COURT: Sure. . . . I would like to get [some] things in the record if I may, please, ma'am. Show that there are no jurors present . . . .

At 6:25 p.m. the jury returned to the courtroom and rendered its verdict.

The defendant argues that the judge's communication with the foreman in regard to whether the jury wanted to continue their deliberations and whether they wanted food brought to them without the other jurors present was reversible error. He says, relying on *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985), that this violated his right to a unanimous verdict guaranteed by Article I, Section 24 of the Constitution of North Carolina. In *Ashe*, we held that it was reversible error not to bring the whole jury to the courtroom before hearing the

foreman's request to be allowed to review certain testimony. In that case we said:

> Our jury system is designed to insure that a jury's decision is the result of evidence and argument offered by the contesting parties under the control and guidance of an impartial judge and in accord with the judge's instructions on the law. All these elements of the trial should be viewed and heard simultaneously by all twelve jurors. To allow a jury foreman, another individual juror, or anyone else to communicate privately with the trial court regarding matters material to the case and then to relay the court's response to the full jury is inconsistent with this policy. . . .

314 N.C. at 36, 331 S.E.2d at 657.

This case is distinguishable from *Ashe*. The judge's conversation with the jury foreman concerned whether the jury would break their deliberations and whether the jury would be furnished a meal. There was no discussion of matters material to the case which the foreman could have conveyed to the other members of the jury. Any error was harmless beyond a reasonable doubt. *State v. Harrington*, 335 N.C. 105, 436 S.E.2d 235 (1993).

This assignment of error is overruled.

[2] The defendant next assigns error to the court's allowing the State to ask certain questions on cross-examination of Dr. Billy Royal, a psychiatrist appointed by the court to examine the defendant. The defendant called Dr. Royal as a witness. Dr. Royal testified that in his opinion the defendant suffers from substance and alcohol abuse. Dr. Royal also testified that in his opinion the defendant has a borderline personality disorder which is a significant illness that begins in early childhood, but may not manifest itself for a number of years. It features suicide attempts, losing control of one's self, having difficulty with relationships and a great many short term relationships and jobs and having problems with sexual identity.

Dr. Royal testified that in his opinion the defendant was also suffering with organic brain syndrome, provisional, which means the defendant may have something organically wrong with his brain. Finally, Dr. Royal testified that in his opinion the defendant suffered from sexual paraphilia, which was manifested by a long history of sexual difficulty, conflicts, problems and behavior. He testified that the defendant is very confused about his sexual orientation and has a huge conflict and huge amount of animosity at some deep level relat-

ed to women. Dr. Royal testified further that the defendant could control his behavior when he was not consuming alcohol. Dr. Royal testified that in his opinion the defendant's behavior is such that at times he is not in control or does not have insight into what he is doing. Dr. Royal testified that one fact on which he based his opinion was that approximately eight months after the defendant had murdered Susan Toler, he kidnapped, raped and cut a woman in Virginia for which he was given two life sentences plus 110 years in prison.

During the cross-examination of Dr. Royal the following colloquy occurred:

Q. [Y]ou referred earlier, Dr. Royal, to an incident that occurred in the State of Virginia for which he was prosecuted. Were you provided with the facts of that occurrence by any source?

A. I was provided that information by [defendant], and I am not certain that I reviewed it otherwise.

. . . .

Q. Dr. Royal, when [defendant] told you about the incident in Virginia in October of 1989 some eight months after he had murdered Susan Toler, did he tell you that he kidnapped a woman—

[DEFENSE COUNSEL]: Your Honor, for the record we would object again for the reasons we stated.

THE COURT: Yes, sir. Overruled.

Q. —who was a secretary in a park service office, who was a stranger to him, raped her, sodomized her, and then cut her throat and left her for dead?

A. He told me that—I am not sure about the cutting her throat. He indicated she was cut and he left her. The terms left her for dead were never used or the concept was never used, but he—the other information he indicated to me, yes, sir.

. . . .

Q. . . . . . Did you also testify that [defendant] had related other acts of violence against women to you that you used as a basis for the opinions you have expressed to this jury?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

. . . .

A. . . . [defendant] did in fact discuss two other incidents in which he's involved with assaultive behavior toward women.

Q. Did you use those or include those in your opinions . . . in this case?

A. Yes, I did.

Q. Did they occur around this same period of time?

A. Yes.

Q. Were they in Virginia or North Carolina?

A. As I understand, they were in Tennessee.

Q. And what activity did they involve?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

A. They involved two episodes occurring within 24 hours, as I understand it, of rape of two other women.

Prior to the defendant's resting his case, the court instructed the jury as follows:

You will recall that you have heard testimony concerning certain matters involving the defendant in Tennessee and in Virginia and you have heard testimony concerning the particular facts of events in Virginia concerning a park service employee, a secretary.

I instruct you now that this evidence may be considered by you only as you find it to bear upon the issue of the basis for Dr. Royal's opinion regarding the mental and emotional condition of the defendant. It may not be considered by you for any other purpose. It may not be considered by you as an aggravating factor in the case. Do all of you understand that instruction? Is there anyone who does not? Will all of you follow that instruction, understand and follow that instruction? Let me know that by just raise [sic] your hands, because if there are any questions about it, I need to know that.

Then I would indicate that the jurors understand and can follow the instruction.

**STATE v. REEVES**

[337 N.C. 700 (1994)]

The defendant contends it was error to allow this testimony by Dr. Royal as to other crimes. N.C.G.S. § 8C-1, Rule 705 (1992) provides:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination. There shall be no requirement that expert testimony be in response to a hypothetical question.

Although Dr. Royal testified that he used the evidence of the rapes and assaults in Virginia and Tennessee as facts on which he based his opinion, which would make them admissible under Rule 705, the defendant nevertheless says it was error to admit this testimony. He says the questions were asked not to test the soundness of Dr. Royal's opinion, but to put before the jury evidence that the defendant had committed other heinous crimes.

The defendant says that the testimony should have been excluded under N.C.G.S. § 8C-1, Rule 403 (1992) which says:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The defendant says the probative value of the evidence of the out-of-state crimes is slight in relation to the impact of the evidence if considered for other purposes. He argues that this evidence is more prejudicial than probative and it should have been excluded under Rule 403. Whether evidence should be excluded under this rule as being more prejudicial than probative is within the discretion of the superior court judge. *State v. Mason,* 315 N.C. 724, 340 S.E.2d 430 (1986). The witness testified that he used the evidence of the Tennessee and Virginia crimes in forming his opinion as to the defendant's condition. This made it relevant under Rule 705. We cannot hold that the court's ruling was so arbitrary that it could not have been the result of a reasoned decision. We cannot hold the court abused its discretion. *State v. Thompson,* 314 N.C. 618, 626, 336 S.E.2d 78, 82 (1985).

This assignment of error is overruled.

**[3]** The defendant next assigns error to the exclusion from substantive evidence of a certified copy of his Virginia convictions and sentences and the preclusion of his arguing that the convictions and sentences were mitigating evidence. In *State v. Price*, 331 N.C. 620, 418 S.E.2d 169 (1992), *vacated and remanded,* —— U.S. ——, 122 L. Ed. 2d 113, *aff'd in,* 334 N.C. 615, 433 S.E.2d 746 (1993), *vacated and remanded,* —— U.S. ——, 129 L. Ed. 2d 888 (1994), we held that evidence that the defendant had been convicted and was serving a sentence for another crime is not mitigating evidence. It was not error to exclude it in this case. This assignment of error is overruled.

**[4]** The defendant next assigns error to certain questions asked of Dr. Royal on cross-examination. Dr. Royal testified that the defendant had functioned well for more than a year in the Craven County jail and that with medication and treatment he believed the defendant "would be safe" in a prison setting. The following colloquy then occurred on cross-examination:

Q. Dr. Royal . . . [d]o you know whether or not [defendant] has ever tried to escape from jail anywhere?

A. Without having specific recall of that, it seems to me there was some suggestion of that once, but I don't—

. . . .

[DEFENSE COUNSEL]: Objection.

Q. Does that refresh your recollection or not?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. I don't recall ever seeing any factual data on that, so I don't have any knowledge of that, except . . . seems to me, I have heard that on one occasion. But I have no data that I can give you on that.

Q. You have heard that he tried to escape from jail—

[DEFENSE COUNSEL]: Objection.

Q.—but you don't have any specific data. Is that your statement, Dr. Royal?

THE COURT: Overruled.

**STATE v. REEVES**

[337 N.C. 700 (1994)]

A. I have heard that he may have. I have not heard in fact that he did.

Q. Would that not have some substantial bearing on his adjustments to prison life, would you say, if he in fact has a documented escape attempt?

A. Well, I don't—again, I don't know the history of that. . . .

The defendant argues that this testimony was not admissible under N.C.G.S. § 8C-1, Rule 705 because only evidence of facts which the witness uses in forming his opinion may be elicited pursuant to that section. Although Rule 705 allows a party to elicit evidence of the underlying facts of a witness' opinion, it does not restrict a party from asking otherwise proper questions. The district attorney asked the witness in this case whether it would affect his opinion that the defendant would adjust well to prison if he had heard the defendant had attempted to escape from prison in Virginia. There has been no suggestion that this question was not asked in good faith. It was well within the scope of proper cross-examination. This assignment of error is overruled.

[5] The defendant next contends it was error not to appoint for him a psychiatrist with expertise in sexual disorders. The defendant made a motion for the appointment of such a person. At the hearing on the motion, the defendant said that he would rely on his serious sexual disorder as a defense. He asked the court to appoint Dr. Fred Berlin, a psychiatrist who directs the Sexual Disorders Clinic at Johns Hopkins University in Baltimore, Maryland, an expert in sexual disorders. The court asked if he had an alternative and the defendant furnished the court with the name of Dr. Billy Royal of Chapel Hill, North Carolina, who specializes in forensic psychiatry generally.

The defendant says that Dr. Royal's performance as the appointed expert showed that he did not provide the constitutionally required assistance. He bases this argument on Dr. Royal's testimony that the defendant had "sexual paraphilia not otherwise designated" and that this sexual disorder affected defendant's behavior. He could not say why defendant committed the crimes he committed, but he was able to control his action until 1985 and then exploded with sexual violence. The defendant argues that this showed Dr. Royal's assistance to him was not constitutionally sufficient.

The first difficulty with this argument by the defendant is that there is nothing in the record which shows a psychiatrist specializing

in sexual problems could have been any more explicit than Dr. Royal. Without such a showing, we cannot say Dr. Royal, a forensic psychiatrist, was inadequate in his help to the defendant.

The second reason the defendant must fail in this assignment of error is shown in the record. Dr. Royal testified that he had consulted with Dr. Faye Sultan, a PhD in psychology, who specialized in dealing with patients with sex problems. Dr. Sultan was in the courtroom and Dr. Royal said she would testify and would go into defendant's sexual fantasy life in more detail.

After Dr. Royal had completed his testimony, the defendant decided not to call Dr. Sultan as a witness. The defendant's attorney told the jury, "[w]e made the decision Dr. Royal's testimony covered everything we needed to." We can only conclude from this that a person who specialized in dealing with sexual problems could not have added anything to Dr. Royal's testimony. This assignment of error is overruled.

**[6]** The defendant next assigns error to the admission of testimony that the victim "was a very good person. She always went to church. She loved her children. She was a good wife and mother. And she was just a very good person, would do anything for anybody, and she died not knowing what happened to her two-and-a-half-year-old child." The defendant contends that this was a victim impact statement which should have been excluded.

The United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720 (1991), recently overruled *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440 (1987) and *South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876, *reh'g denied*, 492 U.S. 938, 106 L. Ed. 2d 636 (1989), and held that a victim impact statement may be admitted at a capital sentencing proceeding unless the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." 501 U.S. at 825, 115 L. Ed. 2d at 735. The evidence of the impact of the victim's death on her family was not so prejudicial that it made the trial fundamentally unfair. The testimony was not barred by the United States Constitution.

The defendant argues that the testimony should have been excluded under N.C.G.S. § 8C-1, Rule 402 and Rule 404(a)(2). Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitu-

**STATE v. REEVES**

[337 N.C. 700 (1994)]

tion of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules. Evidence which is not relevant is not admissible.

This evidence was relevant to give the jury information as to all the circumstances of the crime. There is nothing in the Constitution of the United States or North Carolina, any Act of Congress or the General Assembly or the Rules of Evidence which requires its exclusion. The evidence was not excludable under Rule 402.

Rule 404 provides:

(a) . . . . Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

. . . .

(2) Character of victim. —Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

Rule 404 deals with the offering of evidence of a person's character to show he acted in conformity therewith. That is not why the evidence was offered in this case. Rule 404 has no application to this case.

While evidence of a victim's character may not by the strictest interpretation be relevant to any given issue, the State should be given some latitude in fleshing out the humanity of the victim so long as it does not go too far. The State should not be permitted to ask for the death sentence because the victim is a "good person," any more than a defendant should be entitled to seek life imprisonment because the victim was someone of "bad character." The State did not do so in this case.

The cases upon which the defendant relies are not helpful to him. In *State v. Quick*, 329 N.C. 1, 25, 405 S.E.2d 179, 194 (1991), we held that testimony in the guilt phase of the trial that the victim was a good man who helped people in the community was harmless error. In *State v. Laws*, 325 N.C. 81, 118, 381 S.E.2d 609, 631 (1989), *judgment vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *death sentence aff'd*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 116 L. Ed. 2d

648 (1991), we relied on *Booth* to say a reference by the district attorney to the victims and their families was harmless error. *Booth* has now been overruled. In *State v. Page*, 215 N.C. 333, 1 S.E.2d 887 (1939), we granted a new trial after the defendant had been convicted of rape. The prosecuting witness testified at length about her background in such a way that we said would arouse sympathy for her and prejudice against the defendant in the minds of the jurors. There is no such danger in this case.

This assignment of error is overruled.

[7] The defendant next assigns error to the district attorney's identifying to the jury several members of the family and friends of the victim. During jury selection, the district attorney pointed to "a group of folks seated . . . [in] the courtroom" and identified them as "Susan Toler's family and close friends." He specifically identified several of them and directed her husband to stand up. On several other occasions, he referred to the family members and on one occasion had the victim's husband and two children stand. He also referred to the victim's family during his argument to the jury. The defendant did not object to this, but contends this procedure was used only to prejudice him and is plain error requiring a new trial.

In *State v. Laws*, 325 N.C. at 103, 381 S.E.2d at 622, we held it was not error to identify members of the victim's family who were in the courtroom. This assignment of error is overruled.

[8] The defendant's next assignment of error deals with the testimony of the victim's daughter, Lisa Toler, who was two-and-a-half-years-old at the time of the murder and five years old at the time of the sentencing hearing. The court held a hearing outside the presence of the jury to determine whether the child was competent to testify. At the request of the prosecuting attorney, Lisa was allowed to sit in her stepmother's lap while testifying.

Lisa testified under questioning by the prosecutor that her name was "Lisa Toler;" that she was five-years-old; that she lived with her father and stepmother; that she attended school at Vanceboro Farm Life Elementary School; that her teachers were "Mrs. Wright and Ms. Jackson"; that she went to church with her family and grandmother, but did not know the name of the church; that she knew the difference between telling a lie and telling the truth; that if one tells a lie, "[s]ometimes you get punished, and sometimes you get a whipping"; that she remembered the day her mother died; and "some" of the

things that happened that day; and, that she would tell the truth about what she remembered. On cross-examination, Lisa indicated that she was two-and-one-half-years-old when her mother died. When asked again if she could tell the difference between "telling the truth and lying," Lisa at first answered "yes," but then paused when the question was repeated a number of times. Lisa continued to testify on cross-examination that the principal at her school was "Mr. Bowers," and that she was in kindergarten. When asked again if she could relate the difference between telling the truth and lying, Lisa then responded, "[w]hen you tell lies, sometimes you get punished and sometimes you get a whooping. When you tell the truth, you don't get a whooping and you don't get punished." Lisa recalled that she talked to the prosecutor, but did not remember how many times or when was the last time. Lisa answered that she remembered what happened to her mother, but did not remember if anyone wrote down what she said about her mother's death. In response to a leading question, Lisa indicated that she sometimes forgets what happened to her mother.

The court made findings of fact consistent with this testimony and concluded that the child understood the duty of a witness to tell the truth and was competent to testify. It also concluded that the child's testimony would relate to the last moments of the victim's life and would be helpful to the jury in determining the issues it would have to decide. The court found that any prejudice to the defendant would be outweighed by the value of the testimony to the jury. The court said it had observed the child testify while sitting in her stepmother's lap and her stepmother had not influenced the child in any way and the stepmother could continue to offer the child nourishment and comfort by allowing her to sit in her lap while testifying to the jury.

Lisa's stepmother was then sworn as a witness and identified to the jury. Lisa testified before the jury from her stepmother's lap that she remembered her mother and the day that her mother died; that she and her mother were at home that day; that she was watching television in the living room, and her mother was in the kitchen when Lisa heard someone knock at the door; that her mother did not hear the knock, and when Lisa told her someone was at the door, her mother told her to go into the bathroom; that her mother then went to answer the door; that Lisa hid in the bathroom as instructed, and her mother opened the door; and, that Lisa did not see or hear her mother open the door. Lisa answered that she did not know what happened next, and she did not respond when asked if someone had

entered the bathroom where she was hiding. Lisa also indicated that she did not see the man who entered her mobile home, and that she did not remember anything else that happened that day. Lisa testified that she had forgotten what she earlier had told the prosecutor. Lisa answered that it "hurt" to think about what happened that day, and it made her sad.

The defendant first says under this assignment of error that the undisputed evidence showed that the child was not a competent witness. He says that her age of two-and-a-half years at the time of the murder shows she did not have the capacity to understand facts or relate what happened and if she was then incompetent she was just as incompetent to do so three years later. The defendant also argues that the testimony of the child showed she was incompetent as a witness. He bases this part of his argument on what he says was her inability on five separate occasions to answer when asked the difference between telling the truth and lying.

N.C.G.S. § 8C-1, Rule 601 provides in part:

(a) *General Rule.*—Every person is competent to be a witness except as otherwise provided in these rules.

(b) *Disqualification of witness in general.*—A person is disqualified to testify as a witness when the court determines that he is (1) incapable of expressing himself concerning the matter as to be understood, either directly or through interpretation by one who can understand him, or (2) incapable of understanding the duty of a witness to tell the truth.

We have said that "[t]here is no age below which one is incompetent as a matter of law to testify." *State v. Eason*, 328 N.C. 409, 426, 402 S.E.2d 809, 818 (1991). The court was able to see the witness and determine whether she could express herself. The transcript indicates that she could do so. We know that a five-year-old child can tell what she has observed. We disagree with the defendant's contention that if the child was incompetent to be a witness when she was two-and-a-half years of age, she would be incompetent at five years of age. She could remember what she had observed and be better able to articulate it when she was older.

[9] We also believe the evidence at the hearing supports the court's finding that the child understood the duty of a witness to tell the truth. She testified in effect that a person could be punished for not telling the truth. She did not answer on some occasions when asked

about the difference between telling the truth and not telling the truth, but the court could have found, which it did, from all the testimony that the child understood the duty of a witness to tell the truth. We cannot hold that it was error to find that Lisa was competent to testify.

[10] The defendant next argues under this assignment of error that it was error to allow Lisa to testify to the jury while sitting on her stepmother's lap. The prosecuting attorney requested that this be done which was allowed by the court. The court warned the stepmother that she must not intimate in any way to the child as to how she should testify. After the testimony was complete, the court put in the record a finding that the stepmother had followed the court's instructions.

The defendant contends that it was error to allow this procedure because there was no showing that it was necessary. He says that this was a very prejudicial way of presenting the child's testimony and without any showing that it was necessary should not have been allowed.

This is apparently a case of first impression in this jurisdiction. It has arisen in other states. *See Commonwealth v. Pankraz*, 382 Pa.Super. 116, 125, 554 A.2d 974, 979, *appeal denied*, 522 Pa. 618, 563 A.2d 887 (1989). Implicit in the allowance of the motion to let Lisa sit in her stepmother's lap while testifying was the court's finding that the child would be more at ease and be able to testify better if it was done. Although a court should be cautious in allowing this procedure, we cannot say it was error in this case to allow it. The court had observed the witness and we cannot say the court was wrong in allowing a procedure which it felt would promote the ability of this witness to testify truthfully.

[11] The defendant argues finally under this assignment of error that Lisa's testimony was not relevant under N.C.G.S. § 8C-1, Rule 401 (1992) and should have been excluded under N.C.G.S. § 8C-1, Rule 402 (1992). He also says the testimony was more prejudicial than probative and should have been excluded under N.C.G.S. § 8C-1, Rule 403 (1992).

The defendant says the only aggravating circumstance that was submitted was whether the defendant had previously been convicted of a felony involving the use or threat of violence and Lisa's testimony was not relevant to that or to any element of the State's case. We

have said, "every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966). Lisa's testimony as to the circumstances of her mother's death did "throw light" on the crime, which makes it relevant.

[12]  The defendant also says this testimony was more prejudicial than probative and should have been excluded for that reason. He says this is so because her testimony concerned only background matters and was only cumulative while the manner in which it was introduced with a five-year-old girl sitting in her stepmother's lap was highly inflammatory. In passing on this assignment of error, we must pay a substantial deference to the ruling of the judge. We cannot say he committed error in the admission of otherwise relevant testimony because of the manner in which the testimony was presented.

This assignment of error is overruled.

[13]  The defendant next assigns error to what he contends was the admission of hearsay testimony. The victim's mother-in-law testified that on the morning of the murder she went to the victim's home. Lisa came to the door and said, "Mama is asleep. Mama is dead." The defendant says this testimony by the mother-in-law was inadmissible hearsay.

We hold that this statement by a two-and-a-half-year-old child was an excited utterance and was admissible as an exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(2) (1992). In *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985), we held that a witness could testify to a statement made to her by her four-year-old granddaughter that the defendant had sexually molested her. We said the testimony was properly allowed as an excited utterance. In *State v. Jones*, 89 N.C. App. 584, 367 S.E.2d 139 (1988), the Court of Appeals held that a statement made ten hours after the event by a four-year-old child that the defendant pulled her pants down and "touched my pee patch again" was admissible as an excited utterance.

In this case, the statement by Lisa was made a few hours after the murder. She had been through a startling experience which suspended reflective thought. Her statement was a spontaneous reaction not resulting from fabrication. This assignment of error is overruled.

[14]  The defendant next assigns error to questions asked by the prosecuting attorney during jury selection. The defendant did not object

to any of the questions so we shall consider them under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). The defendant contends there are six different areas in which the prosecuting attorney crossed the line of what is permissible on jury *voir dire*.

The defendant says first that on at least eight occasions, the prosecuting attorney asked questions or made statements substantially as follows:

The jury must not only "apply the law in this case fairly to the [defendant] but also to the Toler family and to Susan Toler."

. . . .

Being a juror "is important to [defendant], but it is important to Susan Toler and her family."

. . . .

Could you "give the [defendant] a fair hearing and the State and Susan Toler a fair hearing?"

The defendant argues that it was a misstatement of the law to suggest the jury was accountable to the victim's family. *State v. Boyd*, 311 N.C. 408, 418, 319 S.E.2d 189, 197 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985). It was not error to tell the jury it should be fair to the victim and her family. This did not, as the defendant contends, stake the jury out. A jury should be fair to all persons interested in a case and it was proper to tell them to do so.

[15] The defendant next argues that in questioning the jury in regard to the mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," N.C.G.S. § 15A-2000(f)(6) (1988), the prosecuting attorney asked questions which improperly staked the jury out not to find this mitigating circumstance.

The defendant had asked the jury whether they would consider intoxication as a mitigating circumstance. The prosecuting attorney asked several questions of the jury to the effect that if they found the defendant had a diminished capacity because of the consumption of alcohol, would they consider before finding this mitigating circumstance that the defendant knew when he consumed alcohol that its use affected him. The defendant, relying on *State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d

155 (1990), says these questions improperly staked the jury out not to find the diminished capacity mitigating circumstance.

In *Leroux*, we held it was not error not to allow a defendant to ask a prospective juror, "[d]o you have such strong feelings about the use of alcohol that you couldn't be fair to someone that you believed to be an alcoholic?" *Id.* at 383, 390 S.E.2d at 325. We said that counsel is not permitted to "fish" for legal conclusions or argue the case to the jury during the jury *voir dire* and for that reason there was no error in prohibiting the question. We said that it is within the discretion of the court as to the extent of an inquiry on jury *voir dire*.

In this case, the prosecuting attorney asked the jurors if they would consider that the defendant voluntarily consumed alcohol in determining whether he was entitled to the diminished capacity mitigating circumstance. This was a proper question. He did not attempt to stake the jury out as to what their answer would be on a hypothetical question.

**[16]** The defendant next argues that it was error for the prosecuting attorney on eleven different occasions to ask the following questions.

If you believe death to be the appropriate sentence, would you be willing to vote to impose death in this case?

. . . .

You realize that if you get to that point where you look at those aggravating and mitigating factors regardless of what the numbers are and say "we have got a capital sentencing law in this case and there are aggravating factor or factors here and this is one of those cases where the death sentence is the appropriate sentence," would you vote to impose the death sentence in this case?

The defendant says these two questions contained inadequate and misleading statements of the law. He says first that jurors cannot vote for death simply because they believe it appropriate. He says further that the questions did not contain any explanation of the manner and procedures under which a death sentence is imposed. We believe the defendant reads the questions too narrowly. The death penalty procedures were explained in detail to the jury before and after the prosecuting attorney asked the disputed questions. The jury should have understood that it was under these procedures that the appropriateness of the death penalty must be determined. An attorney cannot be expected to incorporate in every question all the qualifications

which govern the death penalty. He can rely on these qualifications and procedures being otherwise explained.

We agree with the defendant that the questions had a tendency to stake the jurors out by asking how they would vote on a hypothetical situation. *See State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980). We cannot hold, however, that it was error for the court not to have intervened *ex mero motu*.

[17] The defendant says next that it was error for the prosecuting attorney to say during jury selection that this was a death penalty case. The defendant contends that this was an expression of the prosecutor's personal opinion. This is in fact a death penalty case. The defendant was tried to determine whether he would receive the death penalty. It was not error for the prosecuting attorney to say so.

[18] The defendant next says it was error requiring a new sentencing hearing for the prosecuting attorney to say, "the 12 of you that sit on this jury will recommend either work release or [the] death sentence in this case." Immediately before making this statement and immediately afterwards, the prosecutor told the prospective jurors they would be recommending either a life or death sentence. This misstatement by the prosecuting attorney was not so egregious that it required the court to intervene *ex mero motu*.

[19] Finally, the defendant argues under this assignment of error that it was error for the prosecutor to make the following statement to the jury:

> Now, you know Susan Toler is not here for you to see to look at, the defendant is, and during the course of the several days this hearing will take, do you feel like that would affect or influence your recommendation?

The defendant says it is well settled that a juror may consider a defendant's courtroom presence, appearance, and demeanor in reaching a decision. *State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). He says it was error for the prosecutor to mislead the jury by telling them they could not do so. The thrust of this statement by the prosecuting attorney was for the jury not to be unduly influenced by the absence from the courtroom of the deceased victim. This was a proper statement.

This assignment of error is overruled.

**[20]** The defendant's next assignment of error involves the court's rulings on matters in regard to parole eligibility. The court denied the defendant's motion to question the jurors in regard to their conceptions of parole eligibility. During jury selection two of the jurors asked about the defendant's eligibility for parole and the court instructed them in accordance with *State v. Conner*, 241 N.C. 468, 85 S.E.2d 584 (1955), not to consider parole in their deliberations. The defendant concedes that these rulings are in accord with our decisions, but asks us to change the law in this regard. This we decline to do. This assignment of error is overruled.

**[21]** The defendant's next assignment of error deals with what he contends was prosecutorial misconduct during jury argument. The defendant did not object to any of the matters in the jury argument to which he now assigns error and we must examine them under the plain error rule. We also note that a party is given a broad latitude in jury argument and it is not error for a court not to intervene *ex mero motu* unless the impropriety is glaring or grossly egregious. *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1.

The defendant first argues under this assignment of error that the prosecutor argued things outside the record in three ways. First, he told the jury that if sentenced to life imprisonment, the defendant would have a "cozy little prison cell . . . with [a] television set, air conditioning and three meals a day" and that his prison cell would be "heated and air conditioned." The defendant says there was no evidence in the record as to the condition of any prison cell in which the defendant would be incarcerated. The prosecuting attorney was arguing that the defendant would lead a comfortable life in prison. If he used some hyperbole to describe that life it was not so egregious as to require the court to intervene *ex mero motu*.

**[22]** The defendant next argues there was nothing in the record to support the prosecutor's argument when discussing Lisa Toler's lack of memory in which he said, "she'll probably begin to remember more of [the events]. [S]ome people think a child's mind is like a piece of film. It records it and it develops it later." The prosecutor was arguing what he considered to be general knowledge, which he could do. This argument was not so egregious that it required *ex mero motu* intervention.

**[23]** The third place the defendant says the prosecutor went outside the record is when he was arguing the defendant's sexual disorder and said, "[w]ell, first of all, that never came up until when? It never

came up until he got caught in Virginia for abducting the park service worker. . . . [W]ould have been in his mid twenties is the first time that came up." The defendant argues that all the evidence showed that defendant's sexual disorder was a long-standing problem which manifested itself long before his arrest in Virginia. Dr. Royal testified on cross-examination that it was not until the defendant's arrest in Virginia "that he first revealed in a forensic evaluation or alleged that he had been sexually abused[.]" This would support the argument by the prosecutor.

**[24]** The defendant next argues that he is entitled to a new sentencing hearing because the prosecuting attorney referred to him as a predator. He says, relying on *State v. Hamlet*, 312 N.C. 162, 172, 321 S.E.2d 837, 845 (1984), that this Court has repeatedly condemned prosecutorial arguments which compare defendants to members of the animal kingdom. In *Hamlet*, we said that while we do not condone comparisons of criminal defendants to members of the animal kingdom, the reference to the defendant as an animal in that case was not so egregious as to require the judge to intervene *ex mero motu*. Following the precedent of *Hamlet*, we hold it was not reversible error for the court not to intervene *ex mero motu* in this case.

**[25]** The defendant next contends it was reversible error for the prosecuting attorney to make the following argument:

> But I say to you that even if you do find . . . every one of them and you put them on the scales and you put what you know about this man and that aggravating factor on the other side and you begin to weigh the two, who he is, the life he has chosen to live, his prior record of violence, I say to you folks, greatly outweighs, greatly outweighs what they are arguing to you mitigates the punishment in this case.

The defendant, relying on *State v. Zuniga*, 320 N.C. 233, 267, 357 S.E.2d 898, 919, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), argues that the jury must make its decision based solely on the aggravating and mitigating circumstances found and it was error for the prosecuting attorney to argue that the jury could consider other factors in determining whether the aggravator outweighed the mitigators in this case. Assuming the defendant is correct in this argument, we hold the reference by the prosecutor to matters which were not in evidence was not so egregious as to require the court to intervene *ex mero motu*. The court properly instructed the jury as to how to treat aggravating and mitigating circumstances found.

**[26]** The defendant next argues that it was error for the prosecutor to argue the defendant's rape and kidnapping convictions as reasons for imposing the death penalty after the court had ruled these were not to be considered as substantive evidence but only as factors on which the medical expert based his opinion. The prosecuting attorney did not dwell on this part of his argument and again we cannot hold it was so egregious that the court should have intervened *ex mero motu.*

**[27]** Finally, the defendant says the following argument was improper:

> Today is [defendant's] judgment day. The way he's lead [sic] his life, ladies and gentlemen, he has written his own judgment. On February 6th, 1989, [defendant] wrote his own death warrant when he killed and brutalized Susan Toler. And that death warrant that he has wrote is here before you folks to sign, to make legal.

The defendant says that this argument improperly caused jurors to believe that it was the defendant and not they who was responsible for the death verdict. He says this violates the rule of *Caldwell v. Mississippi,* 472 U.S. 320, 86 L. Ed. 2d 231 (1985), that the jury cannot be led to believe that the responsibility for the imposition rests elsewhere. We disagree. The prosecutor argued that the defendant had brought the death penalty on himself. The jury should have in no way deduced from this that it was not their responsibility to impose the death penalty.

This assignment of error is overruled.

**[28]** The defendant next assigns error to the requirement by the court that he allocute from a different position than the position from which the attorneys argued. The defendant notified the court that he would like to allocute and the court allowed him to address the jury after his attorney had made an opening address and the prosecuting attorney had addressed the jury, but before the defendant's attorney had made his final argument. There was a podium before the jury box from which the attorneys made their arguments which the court had moved to a place in front of the defendant's table from which position the defendant made his allocution.

The defendant says that by requiring him to allocute from a greater distance from the jury than the distance from which the attorneys spoke, the court showed the jurors that it thought the defendant

was an extremely dangerous individual who posed a risk to the jurors' personal safety and that he could not be trusted in society. The defendant says this was an expression of an opinion on the evidence by the judge in violation of N.C.G.S. § 15A-1222 (1988).

The only right of allocution in a capital case in this state is the right to present legal arguments to the judge as to why no judgment should be entered. *State v. Green*, 336 N.C. 142, 190-193, 443 S.E.2d 14, 42-44 (1994). We disagree with the defendant that it was an expression of an opinion on a fact to be proved when the court required the defendant to speak from a position different from the position from which the attorneys spoke. The defendant was not an attorney. His speech to the jury should not have been considered in the same light as the speeches of the attorneys. It was not error for the court to make the distinction which it made.

This assignment of error is overruled.

[29] The defendant next assigns error to a portion of the prosecutor's argument in which the defendant says the prosecutor argued that the defendant killed Mrs. Toler to avoid arrest and for the purpose of eliminating her as a witness. No objection was made to this argument and we shall consider it under the plain error rule. The prosecutor argued as follows:

> If you look at what he did to Alison Clarke (the 1985 Craven County victim) when he cut her, raped her and left her . . . alive as a witness sent him to prison, and then you look at what he did to Susan Toler less than a year after he got out of prison, you can see an escalation in his conduct. You can see that, the first time, he leaves a witness alive and he goes to prison, and the second time, he killed Susan Toler and he doesn't leave a live witness. Escalation of his conduct.

Later in his closing argument the prosecutor said:

> The capacity of the defendant to appreciate the criminality of his conduct was impaired. Well, is that true, or is it true that he killed the witness?

The defendant says that the prosecutor travelled outside the record because there was no evidence that the killing was done to eliminate a witness. He also says the argument was erroneous because it urged the jury to return a death sentence based on an aggravating circumstance which was not supported by the evidence.

**STATE v. REEVES**

[337 N.C. 700 (1994)]

"The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." N.C.G.S. § 15A-2000(e)(4) (1988). The defendant says this requires a new sentencing hearing under *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986).

*Williams* is distinguishable from this case. That case was tried for the second time after we granted a new sentencing hearing because the prosecutor argued witness elimination when there was no evidence of it. At the second sentencing hearing, the prosecutor explicitly and repeatedly argued witness elimination on the same evidence. We held the court should have intervened *ex mero motu*.

Here at one point, the prosecutor said "he [didn't] leave a live witness." At another point, he said "he killed the witness[.]" Those are true statements and they are supported by the evidence. The prosecutor did not explicitly refer to "witness elimination" in the language of the aggravating circumstance. If there was any error in this argument it was not so egregious that it was reversible error for the court not to intervene on its own motion. This assignment of error is overruled.

[30] The defendant next assigns error to the jury's failure to find two statutory mitigating circumstances, N.C.G.S. § 15A-2000(f)(2) and (f)(6) which are: "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance" and "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." The defendant, relying on *State v. Kirkley*, 308 N.C. 196, 220, 302 S.E.2d 144, 158 (1983), says a jury cannot refuse to find and consider a statutory mitigating circumstance which is supported by uncontradicted and credible evidence.

By this assignment of error, the defendant attempts to raise a question as to whether he is entitled to a new sentencing hearing if the jury, under proper instructions, fails to find a statutory mitigating circumstance, which is supported by uncontradicted and credible evidence. We do not have to answer the question in this case. The defendant relied principally on the testimony of Dr. Royal to establish the two mitigating circumstances. When asked whether the defendant's mental condition could have diminished his capacity to understand what he was doing, Dr. Royal said he was "not quite sure" but offered that "often his behavior is such that he is not in control or doesn't have insight into why he's doing what he is doing[.]" Several

witnesses who saw defendant near the time of the crime indicated he did not appear to be under the influence of alcohol or drugs. The evidence in regard to these two mitigating circumstances was not uncontradicted. The jury did not have to find them. *See State v. McCollum,* 334 N.C. 208, 229, 433 S.E.2d 144, 155 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied,* 1994 WL 459889 (1994).

This assignment of error is overruled.

**[31]** The defendant next assigns error to the instruction by the court that the jury could refuse to find any nonstatutory mitigating circumstance which they found did not have mitigating value. He concedes this argument on this point is contra to our decisions. *See State v. Hill,* 331 N.C. 387, 417 S.E.2d 765, *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684, *reh'g denied,* —— U.S. ——, 123 L. Ed. 2d 503 (1993); *State v. Fullwood,* 323 N.C. 371, 373 S.E.2d 518 (1988), *vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *remanded for new sentencing hearing,* 329 N.C. 233, 404 S.E.2d 842 (1991). This assignment of error is overruled.

**[32]** The defendant next assigns error to the jury's failure to find five nonstatutory mitigating circumstances which he says were supported by uncontradicted and manifestly credible evidence and had mitigating value as a matter of law. He says the jury's failure to find these mitigating circumstances rendered the verdict arbitrary and capricious in violation of the Eighth Amendment to the Constitution of the United States. We have rejected this argument in *State v. Hill,* 331 N.C. 387, 417, 417 S.E.2d 765, 780 and *State v. Fullwood,* 323 N.C. 371, 395, 373 S.E.2d 518, 533. This assignment of error is overruled.

**[33]** Under his next assignment of error, the defendant argues that the verdict of the jury was imposed under the influence of passion, prejudice, and arbitrary factors. He bases this argument on the jury's failure to find any of the mitigating circumstances submitted to it. He says many of the circumstances submitted to the jury were supported by uncontradicted and manifestly credible evidence and the only explanation for its action is that it did not act rationally. We cannot hold that because the jury did not find that the defendant's evidence had mitigating value that the jury was acting under passion, prejudice, or any other arbitrary factor. This assignment of error is overruled.

**[34]** The defendant next assigns error to the court's charge on the aggravating circumstance on which the State relied in this case. There

was a stipulation by the State and the defendant that on 23 June 1986, the defendant had pled guilty in Superior Court, Craven County, to second-degree rape and assault on Alison Clarke with a deadly weapon inflicting serious injury which crimes occurred on 19 October 1985. It was further stipulated that the assault involved the defendant's cutting Ms. Clarke with a knife. The State relied on this stipulation to prove the aggravating circumstance N.C.G.S. § 15A-2000(e)(3) (1988), "[t]he defendant had been previously convicted of a felony involving the use or threat of violence to the person."

The court charged the jury that second-degree rape and assault with a deadly weapon inflicting serious injury are by definition felonies involving the use of violence to a person and if they found beyond a reasonable doubt that defendant had been convicted of these crimes, they would find this aggravating circumstance. The defendant says this instruction relieved the State from proving every element of the offense. *Francis v. Franklin*, 471 U.S. 307, 314, 85 L. Ed. 2d 344, 353 (1985). He says this is so because an essential element of the (e)(3) aggravating circumstance is the use or threat of violence. Second degree rape does not always involve the threat or use of violence, N.C.G.S. § 14-27.3(a)(2) (1993), and the defendant says the jury should have been told they had to find this element in order to find the aggravating circumstance.

The defendant had stipulated that the assault and rape had involved cutting the victim with a knife. The rape to which he stipulated did involve violence. When the court charged the jury that the rape to which the defendant had been convicted involved violence, he charged the jury correctly. The jury could have found from the stipulation that the defendant committed the crime. When it did so, it found that the crime involved violence.

This assignment of error is overruled.

[35] The defendant next assigns error to the portion of the charge on two of the mitigating circumstances submitted to the jury which were N.C.G.S. § 15A-2000(f)(2), "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance" and (f)(6) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired."

As to each submitted circumstance, the court charged substantially as follows:

I instruct you that you would find this mitigating circumstance if you find any of the diagnoses about which the witness Dr. Royal testified—that is: substance abuse, alcohol, borderline personality disorder, paraphilia not otherwise specified, organic mental syndrome provisional, alcohol or drug abuse or any other mental or emotional disturbance or personality disorder . . . that was long standing and deep seated in its nature and that it was coupled with the use of alcohol and appears to result in aggressive and generally impulsive violent behavior toward women; or if you find the defendant attempted suicide in July of 1989; and if you find that, as a result, the defendant was under the influence of [a] mental or emotional disturbance when he killed the victim.

The defendant argues that he suffered from mental and emotional disturbances and had sources of impaired capacity other than those listed by the court and it was error for the court to limit the jury's consideration to matters listed. The court instructed the jury they could consider some of the things to which Dr. Royal testified and "any other mental or emotional disturbance or personality disorder." The court did not restrict the jury in what it could consider in determining whether to find either of these mitigating circumstances.

This assignment of error is overruled.

[36] The defendant next assigns error to the court's refusal to let him rehabilitate a juror whom the State challenged for cause pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968). Under questioning by the prosecutor, the prospective juror said that her feelings about the death penalty "would prevent or substantially impair [her] ability to follow the court's instruction and vote to impose the death sentence in this case." The court then asked the prospective juror, "[c]ould you, given your present view with respect to the imposition of the death penalty, impose the death penalty in this or any other case?" The juror answered "[n]o, I couldn't." The court then allowed the State's challenge for cause.

There is no showing that further questioning by the defendant would have produced a different answer from that given to the court. It was not error for the court to deny the defendant the right to question the prospective juror further. *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). This assignment of error is overruled.

[37] The defendant's last assignment of error is to the court's allowing the State to challenge peremptorily several jurors who expressed

reservations about the death penalty but could not have been challenged for cause under *Witherspoon*. The defendant candidly concedes that we have held to the contrary. *State v. Fullwood*, 323 N.C. 371, 381-82, 373 S.E.2d 518, 525. He asks that we reconsider our position on this question. We decline to do so. This assignment of error is overruled.

We find no error in the defendant's sentencing hearing.

## Proportionality Review

[38] Having found no error in the trial, we are next required by N.C.G.S. § 15A-2000(d) to determine whether the record supports the jury's finding of the aggravating circumstance upon which the sentence was based and whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. We must also determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

There is nothing in the record which shows that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The record supports the finding of the aggravating circumstance on which the death penalty was based. The defendant stipulated to sufficient facts to support the finding of this circumstance.

We must next determine whether the sentence of death was excessive or disproportionate to the sentence imposed in similar cases, considering both the crime and the defendant. In determining proportionality, we are impressed with the cold-blooded, callous and brutal nature of this murder. According to his own statement, the defendant entered the home of a person he did not know, ordered her to send her two-and-a-half-year-old child from the room, forced her to undress and sexually assaulted her using two different types of instruments, including one with a sharp edge capable of inflicting an incised wound found within her vagina. A bloody footprint and bloodstains on the soles of the victim's foot indicated she had stepped in blood at some point during the assault. Finally, the defendant placed a pillow over the victim's face, pressed the barrel of a pistol hard against the pillow and pulled the trigger. The victim died as the result of a single gunshot wound to the head. We can imagine the terror

Susan Toler felt as she went through this torture, knowing all the while that her two-and-a-half-year-old child was in the home and subject to the brutality she was suffering.

Our search of the pool of cases which we use to determine proportionality reveals there are fourteen cases in which the only aggravating circumstance found was the (e)(3) circumstance that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person" and the defendant was sentenced to life in prison. There is one case, *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, in which this was the sole aggravating circumstance found by the jury and the jury returned the death sentence. In affirming the death penalty in *Brown*, we held that there were several factors which distinguished that case from the cases in which life sentences were imposed. Among these factors were (1) the sanctity of the victim's home was invaded, (2) the murder was as calculated as it could have been, and (3) the defendant showed no remorse for the killing. All these factors are present in this case. This case is more similar to *Brown* than to the other cases which found the prior felony conviction circumstance and the jury recommended life.

We have said that the final decision as to whether a death sentence is proportionate in a particular case rests upon the "experienced judgments" of this Court. *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 46 (1994). In this case, the jury heard the evidence that the defendant had raped and murdered an innocent woman. They heard the evidence that he had raped and assaulted a woman a few years previously and shortly after being released from prison he had raped again. The second time he did not simply assault his victim, but brutally murdered her. This could have added great weight in the judgment of the jury, as it does in our judgment, to the aggravating circumstance that was found. This was a very brutal murder.

We are confident that the sentence of death imposed in this case is not excessive or disproportionate to the penalty imposed in similar cases.

NO ERROR.