STATE OF NORTH CAROLINA v. GLENN EDWARD CHAPMAN

No. 569A94

(Filed 8 December 1995)

**1. Constitutional Law § 343 (NCI4th)— first-degree murder— pretrial conference—defendant absent—no error**

There was no error in a prosecution for two first-degree murders where defendant was absent from the pre-trial conference

required in capital cases by Rule 24 of the General Rules of Practice for the Superior and District Courts. A defendant's right to be present at all stages of his trial does not arise prior to the commencement of trial, and the Rule 24 conference, which takes place before the jury panel is selected and sworn, is not a stage of the trial. The pretrial conference is an administrative device intended to clarify the charges against the defendant and assist the prosecutor in determining whether any aggravating circumstances exist which justify seeking the death penalty. Defendant has not demonstrated that the Rule 24 pretrial conference implicated his confrontation rights or that his presence at the conference would have had a reasonably substantial relation to his opportunity to defend.

**Am Jur 2d, Criminal Law §§ 695, 696, 910, 911.**

2. **Criminal Law § 1334 (NCI4th)— first-degree murder— aggravating circumstance—not mentioned at pretrial conference**

There was no error in a prosecution for two first-degree murders where the prosecutor mentioned at the Rule 24 pretrial conference the aggravating circumstance of a previous conviction involving a violent felony and did not mention the course of conduct aggravating circumstance, but that circumstance was submitted to the jury. While Rule 24 requires the trial court and the parties to consider the existence of evidence of aggravating circumstances, nothing in the rule intimates that the prosecution must enumerate with finality all aggravating circumstances it will pursue at trial and a trial court cannot require the prosecution to declare which aggravating circumstances it will rely upon at the punishment phase.

**Am Jur 2d, Criminal Law §§ 598, 599.**

3. **Jury § 141 (NCI4th)— first-degree murder—jury selection—questions concerning parole—not allowed**

There was no error in a prosecution for two first-degree murders where the trial court denied defendant's motion to permit *voir dire* of potential jurors regarding their conceptions of parole eligibility. The jury here did not inquire about parole eligibility, the prosecutors did not argue future dangerousness to the jury, and defendant's contention that arguing the aggravating circumstances of a previous felony conviction involving violence and

course of conduct amount to arguing future dangerousness is unpersuasive. Defendant has not advanced any reason for the N.C. Supreme Court to reverse its precedents holding that prospective jurors should not be questioned about their opinions concerning a defendant's eligibility for parole upon conviction.

**Am Jur 2d, Jury §§ 205 et seq.**

**4. Evidence and Witnesses § 1009 (NCI4th)— first-degree murder—unavailable witness—statement read to jury**

There was no error in a prosecution for two first-degree murders where a fire inspector was allowed to read to the jury a statement from a vagrant who could not be located at the time of the trial and who had been living in a vacant house where one of the victims was found. The statement contained sufficient indicia of reliability to be admissible in that the vagrant had personal knowledge of the underlying event, there is no evidence that he had any reason to tell the fire inspector anything other than the truth, and there is no evidence that he ever recanted this statement. Even if the admission of this testimony was erroneous, defendant cannot show prejudice in light of his incriminating remarks to several others stating that he killed this victim.

**Am Jur 2d, Evidence §§ 690-707.**

**5. Criminal Law § 300 (NCI4th)— first-degree murder—joinder of two charges against one defendant—no error**

There was no error in the joinder of two first-degree murder charges where the facts incident to the two murders reveal a common *modus operandi* and a temporal proximity sufficient to establish a transactional connection, the defendant did not cite and the Court was not aware of any requirement that there be a commonality of witnesses, and, although defendant argued that he would not have been convicted of the Conley murder without the spillover of the stronger Ramseur evidence, there was substantial evidence from which the jury could determine that defendant killed Conley. Viewing the record as a whole, the offenses were not so separate in time and place and so distinct in circumstance that joinder was unjust and prejudicial to defendant. N.C.G.S. § 15A-926(a).

**Am Jur 2d, Actions §§ 86 et seq.**

**6. Criminal Law § 1337 (NCI4th)— first-degree murder— aggravating circumstances—previous conviction involving violence**

The record in a prosecution for two first-degree murders supported the aggravating circumstance of a previous felony conviction involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), in that defendant testified that he had been convicted of common law robbery within the last ten years, the State offered records illustrating the conviction, and the victim testified that defendant used violence during the robbery.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**7. Criminal Law § 1347 (NCI4th)— first-degree murder— aggravating circumstances—course of conduct**

The record in a prosecution for two first-degree murders supported the aggravating circumstance of course of conduct, N.C.G.S. § 15A-2000(e)(11), where the two victims were young women with drug habits; defendant knew both and had smoked crack with each; their bodies were disposed of in virtually the same fashion and within two blocks of each other; both victims suffered blunt-force injuries to their heads; defendant was seen with, and had sex with, one victim shortly before her death; he made incriminating statements to three people about having killed the other victim; and defendant had a foreboding attitude toward women when he was smoking crack.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**8. Criminal Law § 1373 (NCI4th)— first-degree murder—sentencing—finding of aggravating circumstances and no mitigating circumstances—not evidence of passion or prejudice**

There was nothing in the record to support the contention of a defendant convicted of two first-degree murders that the finding of both aggravating circumstances submitted and no mitigating circumstances was evidence of the jury's strong emotional or passionate feeling of prejudice toward defendant.

**Am Jur 2d, Criminal Law §§ 625 et seq.**

**9. Criminal Law § 1373 (NCI4th)— first-degree murder— death sentence—not disproportionate**

A sentence of death for two first-degree murders was not disproportionate where the jury found aggravating circumstances of

course of conduct and a previous felony conviction involving violence. In none of the seven cases in which the N.C. Supreme Court has found the death sentence disproportionate has the defendant been convicted of more than one murder; the two aggravating circumstances found here are among the four which have been held sufficient to justify a death sentence standing alone; none of the cases in which the death sentence was found disproportionate involved a second murder as the course of conduct; the victims here were vulnerable in that they were women who engaged in the high-risk lifestyle of regular drug use; defendant appears to have no remorse; and there is no discernible reason why defendant killed these two women.

**Am Jur 2d, Criminal Law §§ 625 et seq.**

Justice WEBB dissenting.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Ferrell, J., at the 31 October 1994 Criminal Session of Superior Court, Catawba County, upon two jury verdicts finding defendant guilty of first-degree murder. Heard in the Supreme Court 10 October 1995.

*Michael F. Easley, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*W. Thomas Portwood, Jr., and Robert W. Adams for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first-degree murders of Tenene Yvette Conley and Betty Jean Ramseur and sentenced to death for each murder. He appeals from his convictions and sentences. We conclude that defendant received a fair trial, free of prejudicial error, and that the sentences of death are not disproportionate.

The State's evidence tended to show that Conley was a young, black female who used crack cocaine daily and paid for her habit through prostitution. Conley's body, naked from the waist down, was found in the basement of a vacant house at 649 First Avenue, S.E., in Hickory on 15 August 1992. There was no sign of a forced entry into the house. Defendant, who had been hired in July 1992 to paint the

trim on the outside of the house, had been inside and knew how to get into the house.

Dr. Thomas Clark, a forensic pathologist who performed the autopsy, concluded Conley died as a result of manual strangulation. Dr. Clark opined that the abrasions found about Conley's head and forehead could have been made by contact with any type of blunt object, including the floor. He determined Conley had had sexual intercourse within twelve hours of her death, and DNA analysis of the sperm sample taken from her body matched a sample given by defendant.

Several persons saw defendant and Conley together during the early morning hours of 14 August 1992. Jamar Danner, who sold crack cocaine from his house, saw defendant and Conley together well before daylight. Danner testified that defendant and Conley had come to his house in search of cocaine; they left without purchasing any cocaine and walked toward the house where Conley's body was found. Howard Cowans, who lived within a block of the house in which Conley's body was found, testified that defendant, Conley, and Danny Blackburn came to his home around 3:00 a.m. on 14 August 1992. Defendant was trying to sell a lawn mower. The group smoked crack in Cowans' home. A few minutes after defendant, Conley, and Blackburn went outside, Cowans observed a man and a woman exit Blackburn's car and walk toward the house in which Conley's body was found. Cowans could not identify the man but implied it was defendant, stating that Blackburn did not "give up his old lady's car for anything or anybody." Blackburn testified that after the group finished smoking crack, he offered defendant the use of his car for ten dollars; defendant refused, saying, "she is getting out of the car, she knows what the hell she got to do, she knows what she has got to do." Conley got out of the car and began walking up the street, followed closely by defendant.

In a statement made to police on 18 September 1992, defendant acknowledged painting and cleaning the house in which Conley's body was found. However, he stated he went to Sunny Valley, not Cowans' house, on 14 August 1992. He also denied leaving Sunny Valley with Conley, insisting that when he left, Conley and Blackburn were together. Defendant's statement also noted: "When I smoked [sic] rock I don't want to be around women. They are always wanting something and bothering me and s——."

Ramseur, who was white, had been dating Chris Walker for about three years before she died. Ramseur and Walker knew defendant, and the three formerly smoked crack together. Ramseur was on probation and was last seen by her probation officer on 11 June 1992 regarding a probation violation involving the use of controlled substances.

On the morning of 12 June 1992, a fire at 407 Highland Avenue, S.E., in Hickory was reported. Alvin Creasman, a vagrant who had been living in the house, told a fire inspector that he was asleep upstairs when he was awakened by smoke. He noticed a black male and a white female at the house that morning about daybreak. Thomas Rasmussen, an SBI fire investigator, determined that the fire had been caused by human hands, either accidentally or intentionally.

On 22 August 1992 Ramseur's badly decomposed, naked body was found under the house at 407 Highland Avenue. Dr. Brent Hall, the pathologist who performed the autopsy, determined Ramseur had died sometime in June 1992. Although he could not rule out the possibility that Ramseur had been strangled because her body was partially skeletonized, Hall opined Ramseur had died as a result of a blunt-trauma injury to the head consistent with having been struck with a brick.

Defendant told at least three people that he had killed Ramseur. Defendant's cousin, Nicole Cline, testified that in June 1992 defendant told her he had just killed Chris Walker's girlfriend by cracking her in the head with a brick. He pointed from Nicole's residence to the house at 407 Highland Avenue and said he had dragged the body under the house. Brian Cline, Nicole's brother, testified that he overheard this conversation. Following this conversation but before Ramseur's body was discovered, Brian and defendant were driving down Highland Avenue when defendant pointed to the house at 407 and said that if people continued to mess with him, they would "end up like that bitch that was under the house." Lavar Gilliman testified that during the summer of 1992, he overheard defendant say that he had killed someone, that the body was in the house on Highland Avenue, and that defendant was going to burn her body so that it could not be found.

Defendant testified that he knew Conley and had gotten high with her on one occasion. He knew Ramseur through Chris Walker. He admitted having sex with Conley on 13 August 1992 but denied going with her to Cowans' and Danner's houses. Defendant further denied

telling Nicole and Brian Cline that he had killed a woman, and he denied ever having seen Lavar Gilliman before Gilliman testified. He denied killing either woman.

At sentencing the State offered evidence that defendant had been previously convicted of common law robbery. The victim of this robbery testified to defendant's actions during the robbery.

Defendant offered evidence that he provided for Gwyn Anderson and their child and that he was helpful toward his friends and neighbors. His father testified that he always counted on defendant to take care of the house and to help with the other children as defendant was growing up.

Dr. Mark Worthing, a psychologist, testified defendant was of low average intelligence. Defendant had been diagnosed with alcohol and cocaine dependency. Dr. Worthing opined defendant could appreciate the criminality of his conduct unless he was very severely impaired. Because defendant denied committing the murders, Dr. Worthing was unable to ask specific questions about what drugs he had used at the time of the offenses and thus was unable to determine the extent of defendant's impairment at that time.

The jury found two aggravating circumstances for both murders: that defendant had been previously convicted of a felony involving the use or threat of violence to the person and that the murder for which defendant stood convicted was part of a course of conduct in which defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons. Although three statutory and sixteen nonstatutory mitigating circumstances were submitted to the jury, no juror found any mitigating circumstance.

[1] Defendant first assigns as error his absence from the pretrial conference required in capital cases by Rule 24 of the General Rules of Practice for the Superior and District Courts. He contends that his absence from the Rule 24 conference violated his right to be present at every stage of his trial.

The Confrontation Clause in Article I, Section 23 of the North Carolina Constitution " 'guarantees an accused the right to be present in person at every stage of his trial.' " *State v. Daniels,* 337 N.C. 243, 256, 446 S.E.2d 298, 307 (1994) (quoting *State v. Payne,* 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987)), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 895 (1995). This right to be present extends to all times dur-

ing the trial when anything is said or done which materially affects defendant as to the charge against him. *State v. Brogden*, 329 N.C. 534, 541, 407 S.E.2d 158, 163 (1991). A capital defendant may not waive his right to presence. *Daniels*, 337 N.C. at 257, 446 S.E.2d at 307. However, a defendant's right to be present at all stages of his trial does not arise prior to the commencement of trial. *State v. Rannels*, 333 N.C. 644, 653, 430 S.E.2d 254, 259 (1993) (citing *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992)).

Defendant contends his case must be distinguished from *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). In *Huff*, where the defendant was absent during a portion of the State's presentation of evidence at the request of defense counsel and with the defendant's agreement, this Court held that the trial court erred in permitting defendant to be absent during his capital trial. However, we found that the error was harmless beyond a reasonable doubt because the defendant was not prejudiced by his absence. *Id.* at 35-36, 381 S.E.2d at 654-55. Here, because defendant's attorney objected to his absence at the Rule 24 conference, defendant contends he is entitled to a new trial.

In *Huff* the defendant was absent in the midst of trial, while the State was presenting evidence. Here defendant was absent during the pretrial conference. We hold that the Rule 24 conference, which takes place before the jury panel is selected and sworn, is not a stage of the trial. *See State v. Smith*, 326 N.C. 792, 794, 392 S.E.2d 362, 363 (1990) (process of selecting and impaneling the jury is a stage of trial at which defendant has a right to be present); *State v. Rannels*, 333 N.C. at 652-54, 430 S.E.2d at 258-59 (private, unrecorded, side-bar conferences with jury pool members took place before commencement of defendant's trial; no right to presence); *State v. Cole*, 331 N.C. at 275, 415 S.E.2d at 717 (pretrial, off-the-record bench conferences with prospective petit jurors did not occur at a stage of defendant's trial; no right to presence). Therefore, defendant's right to be present at every stage of his trial was not implicated.

The language of Rule 24 does not offer defendant relief. Rule 24 provides that in capital cases, the superior court shall require "the prosecution and defense counsel" to appear at a pretrial conference to discuss, *inter alia*, the simplification and formulation of the issues and timely appointment of assistant counsel for an indigent defendant. Gen. R. Pract. Super. and Dist. Ct. 24, 1995 Ann. R. N.C. 18. The

STATE v. CHAPMAN

[342 N.C. 330 (1995)]

pretrial conference is an administrative device intended to clarify the charges against the defendant and assist the prosecutor in determining whether any aggravating circumstances exist which justify seeking the death penalty. Capital defendants do not stand to lose or gain any rights at the conference. Defendant has not demonstrated that the Rule 24 pretrial conference implicated his confrontation rights or that his presence at the conference would have had a reasonably substantial relation to his opportunity to defend. *See State v. Buchanan,* 330 N.C. 202, 223-24, 410 S.E.2d 832, 845 (1991) (burden on defendant to show usefulness of his presence); *see also State v. Buckner,* 342 N.C. 198, —— S.E.2d —— (1995). This assignment of error is therefore overruled.

[2] By his next assignment of error, defendant contends the trial court erred in submitting to the jury the course of conduct aggravating circumstance because the prosecutor did not mention that circumstance at the Rule 24 pretrial conference. At the pretrial conference, the prosecutor indicated that an aggravating circumstance existed pursuant to N.C.G.S. § 15A-2000(e)(3), as defendant had been previously convicted of a violent felony, common law robbery. Defense counsel responded, "That is at least one," and later stipulated that at least one aggravating circumstance existed for both murders. Defendant now argues that the prosecutor "blindsided" him and lulled him into a false sense of security by failing to mention the presence of another aggravating circumstance, course of conduct, pursuant to N.C.G.S. § 15A-2000(e)(11). Because of his surprise, defendant contends, he was unable to rebut this circumstance at his sentencing proceeding.

While Rule 24 requires the trial court and the parties to consider the existence of evidence of aggravating circumstances, nothing in the rule intimates that the prosecution must enumerate with finality all aggravating circumstances it will pursue at trial. Moreover, "a defendant is not constitutionally entitled to an enumeration of aggravating factors to be used against him: statutory notice as contained in N.C.G.S. § 15A-2000(e) is sufficient." *State v. McLaughlin,* 323 N.C. 68, 84, 372 S.E.2d 49, 61 (1988), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). In fact, a trial court cannot require the prosecution to declare which aggravating circumstances it will rely upon at the punishment phase. *State v. Holden,* 321 N.C. 125, 153, 362 S.E.2d 513, 531 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). This assignment of error is therefore overruled.

**[3]** Defendant next contends that the trial court erred in denying his motion to permit *voir dire* of potential jurors regarding their conceptions of parole eligibility upon the entry of a life sentence. Because the prosecutor argued two aggravating circumstances to the jury—that defendant had previously been convicted of a felony involving the use or threat of violence to a person and that the murder for which defendant was convicted was part of a course of conduct in which defendant engaged—and because the jury found both aggravating circumstances, defendant asserts that the prosecutor placed defendant's future dangerousness at issue. In *Simmons v. South Carolina,* —— U.S. ——, ——, 129 L. Ed. 2d 133, 138 (1994), the United States Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Relying on *Simmons,* defendant contends that the trial court should have granted his motion to discuss potential jurors' conceptions about parole eligibility.

Defendant's reliance on *Simmons* is misplaced. In *Simmons,* after the prosecutor argued Simmons' potential for future dangerousness as a reason for imposing the death penalty, Simmons requested the trial court to instruct the jury on the meaning of life imprisonment under South Carolina law (no possibility of parole). The trial court refused Simmons' request, and the jury ultimately returned a verdict of death. In *State v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 224 (1995), this Court noted that "[t]he Court in *Simmons* ruled that South Carolina could 'not create a false dilemma by advancing generalized arguments regarding defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole.'" *Id.* at 762, 448 S.E.2d at 830-31 (quoting *Simmons,* —— U.S. at ——, 129 L. Ed. 2d at 147). Although the prosecutor in *Price* argued defendant's future dangerousness to the jury, this Court affirmed Price's death sentence, concluding that *Simmons* controlled only where life without possibility of parole was the alternative to a death sentence. *Id.* at 762-63, 448 S.E.2d at 831. As Price would have been parole eligible had he been sentenced to life imprisonment in North Carolina, N.C.G.S. § 15A-1371(a1) (1988), no "false dilemma" had been created. *See Price,* 337 N.C. at 762, 448 S.E.2d at 831. In addition, the jury in *Price* had not inquired about defendant's parole eligibility; the Court noted that without such an inquiry, parole eligibility is irrel-

STATE v. CHAPMAN

[342 N.C. 330 (1995)]

evant and should not be considered in making a capital sentencing determination. *Id.* at 763, 448 S.E.2d at 831.

As in *Price*, the jury here did not inquire about defendant's parole eligibility. Defendant's case is actually less persuasive than that in *Price* because the prosecutors here did not argue future dangerousness to the jury; defendant's contention that arguing the aggravating circumstances amounted to arguing future dangerousness is unpersuasive. Therefore, *Simmons* provides no relief for defendant.

Further, this Court recently again followed its previous decisions and held that prospective jurors should not be questioned about their opinions concerning a defendant's eligibility for parole upon conviction. *State v. Moore*, 335 N.C. 567, 591, 440 S.E.2d 797, 811, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174 (1994). Defendant has not advanced any reason why the Court should reverse this precedent. This assignment of error is overruled.

**[4]** Defendant next contends that the trial court erred in allowing Raymond Mitchell, a fire inspector with the Hickory Fire Department, to read into evidence the hearsay statement Alvin Creasman made to Mitchell on 12 June 1992. Although defendant acknowledges that the State gave notice, pursuant to Rule 804(b)(5) of the North Carolina Rules of Evidence, of its intention to use Creasman's hearsay statement, he argues that the statement was inadmissible under Rule 804(b)(5) because there was insufficient indicia of the statement's reliability. The statement read to the jury is as follows:

> There was a fire in the living room. There was clothing found in the area of the living room. I was in the hallway asleep upstairs. The smoke woke me up. I notice[d] a black male and a white female there this morning about day break. I stayed all night here. I am a smoker.

Before Mitchell read Creasman's statement to the jury, the trial court conducted a hearing on the admissibility of the statement. Following that hearing the trial court concluded, pursuant to requirements this Court set forth in *State v. Triplett*, 316 N.C. 1, 9, 340 S.E.2d 736, 741 (1986), that the State had unsuccessfully attempted to locate Creasman, that the statement was trustworthy, that the statement was material and more probative on the issue than any other evidence which the prosecution could secure through reasonable means, and that justice would be served by admission of the statement. Mitchell

subsequently read the statement to the jury, pursuant to Rule 804(b)(5).

In *Triplett*, this Court reiterated the factors which a trial court must consider in determining whether a hearsay statement sought to be admitted under Rule 804(b)(5) is trustworthy: (1) whether the declarant had personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination. *Id.* at 10-11, 340 S.E.2d at 742. Applying these factors, we conclude that Creasman's statement contained sufficient indicia of reliability to be admissible. Creasman had personal knowledge of the underlying event, for he stated that he noticed the black male and the white female at the Highland Avenue house about daybreak. There is no evidence that Creasman had any reason to tell Mitchell anything other than the truth about this matter. Nor is there any evidence that Creasman ever recanted this statement. Finally, the trial court determined that Creasman could not be found at the time of trial. Even if the trial court erred in admitting the testimony, defendant cannot show he was prejudiced by its admission in light of his incriminating remarks to several others stating that he killed Ramseur. This assignment of error is therefore overruled.

[5] In his next assignment of error, defendant contends that joinder of the two murder charges violated N.C.G.S. § 15A-926(a) and deprived him of the due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 18 and 19 of the North Carolina Constitution. Defendant objected to the State's written motion for joinder, but the trial court granted the motion following arguments by the parties. Defendant argues joinder was improper because the charges were not transactionally related, in that none of the witnesses testified concerning both the Ramseur and Conley murders, and the murders occurred approximately two months apart. In fact, defendant contends, the only connection in the two cases is that he is charged with both crimes. For the following reasons, we reject defendant's contentions.

N.C.G.S. § 15A-926(a) provides, in pertinent part, that "[t]wo or more offenses may be joined . . . for trial when the offenses . . . are based . . . on a series of acts or transactions connected together or constituting parts of a single scheme or plan." Once it has been deter-

mined that offenses have a transactional connection, trial courts have discretion to consolidate them for trial. *State v. Huff*, 325 N.C. at 22-23, 381 S.E.2d at 647. Whether offenses are transactionally related is a question of law fully reviewable on appeal. *Id.* at 22, 381 S.E.2d at 647.

> A mere finding of the transactional connection required by the statute is not enough, however. . . . [T]he trial judge must consider whether the accused can receive a fair hearing on more than one charge at the same trial; if consolidation hinders or deprives the accused of his ability to present his defense, the charges should not be consolidated.

*State v. Silva*, 304 N.C. 122, 126, 282 S.E.2d 449, 452 (1981).

The facts incident to the two murders here reveal a common *modus operandi* and a temporal proximity sufficient to establish a transactional connection. Both victims were young women with drug habits; defendant knew both and had smoked crack with each. One victim was nude when found, and the other was nude from the waist down. Both victims suffered blunt-force injuries to their heads; Conley died as a result of strangulation, and the pathologist could not rule out the possibility that Ramseur had also been strangled. The women were killed within two months of each other, and their bodies were found in the lowest part of vacant houses within two blocks of each other. Defendant was seen with and had sex with Conley shortly before her death, and he made incriminating statements to three people about having killed Ramseur. Defendant also made several statements in which he exhibited a misogynistic attitude toward women, including his statement to Brian Cline that "[i]f people keep f——— with me they [will] end up like that bitch that was under the house." Defendant has not cited to, and we are unaware of, any requirement that there be a commonality of witnesses where two murder cases have been joined for trial.

Defendant argues that he was denied a fair hearing as a result of the joinder. Specifically, he contends that the strength of the evidence against him in the Ramseur murder "spilled over" into the deliberations on the Conley murder and that he would not have been convicted of the Conley murder without that spillover effect.

Contrary to defendant's argument, there was substantial evidence adduced from which the jury could determine that defendant killed Conley. Like Ramseur, Conley had sustained a blunt-force injury to

the forehead. Conley had had sexual intercourse within twenty-four hours of her death, and DNA testing of the semen found demonstrated a match with defendant. Jamar Danner, Howard Cowans, and Danny Blackburn all saw defendant with Conley in the early morning hours of the day before her body was discovered. After defendant, Conley, and Blackburn left Cowans' home, Cowans had observed a man and a woman get out of Blackburn's car and walk toward the house in which Conley's body was found. Blackburn stated that after the group finished smoking crack, Conley and then defendant got out of Blackburn's car and began walking up the street.

In light of this evidence, we conclude that defendant has failed to show that the trial court abused its discretion in allowing the charges to be consolidated for trial. Viewing the record as a whole, we hold that the offenses were not so separate in time and place and so distinct in circumstance that joinder was unjust and prejudicial to defendant. *See State v. Bracey*, 303 N.C. 112, 118, 277 S.E.2d 390, 394 (1981).

Having found no statutory violation, we now turn to defendant's contention that consolidation of these two murder charges for trial violated his federal and state constitutional due process rights. Defendant merely asserts that the dissimilar facts surrounding the murders hindered a fair determination of his guilt or innocence, which, he asserts, deprived him of due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 18 and 19 of Article I of the North Carolina Constitution. As defendant makes no argument or explanation of how consolidation of the offenses for trial violated any of these provisions, we decline to address his assertions. *Huff*, 325 N.C. at 26, 381 S.E.2d at 649.

[6] Finally, defendant argues, pursuant to N.C.G.S. § 15A-2000(d)(2), that the record does not support the aggravating circumstances found by the jury; that the sentence was imposed under the influence of passion, prejudice, or some other arbitrary factor; and that the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant.

The jury found two aggravating circumstances for each offense: that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3) (Supp. 1994); and that the murder for which defendant stood convicted was part of a course of conduct in which defendant engaged

and which included the commission of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The record supports the jury's finding of the (e)(3) aggravating circumstance. Defendant testified he had been convicted of common law robbery within the last ten years, and the State offered Catawba County criminal records illustrating the conviction. The robbery victim there testified that defendant used violence in the commission of the robbery. Thus, there was substantial evidence that defendant had been convicted of a felony which involved the use or threat of violence to the person and that the felony occurred prior to the murders at issue in this case. *See State v. Goodman,* 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979).

[7] The record also supports the jury's finding of the (e)(11) aggravating circumstance. Some connection between the violent events is generally required to support this circumstance. Even events remote from each other in time may be connected by *modus operandi* or motivation. *See State v. Cummings,* 332 N.C. 487, 507-12, 422 S.E.2d 692, 703-06 (1992) (course of conduct circumstance properly submitted to jury where two murders took place twenty-six months apart but common *modus operandi* and motivation were present); *State v. Price,* 326 N.C. 56, 81-83, 388 S.E.2d 84, 98-99 (course of conduct circumstance properly submitted to jury where other crimes of violence, arson and hostage-taking, occurred five days after murder at issue and common *modus operandi* and motivation were present), *sentence vacated on other grounds,* 498 U.S. 802, 112 L. Ed. 2d 7 (1990). In order to permit a finding of a course of conduct, a court must "consider the circumstances surrounding the acts of violence and discern some connection, common scheme, or some pattern or psychological thread that ties them together." *Cummings,* 332 N.C. at 510, 422 S.E.2d at 705.

As noted above, several similarities tie the instant murders together and suggest a common motivation or *modus operandi.* The victims were young women with drug habits; defendant knew both and had smoked crack with each. Their bodies were disposed of in virtually the same fashion and within two blocks of each other. Both victims suffered blunt-force injuries to their heads. Defendant was seen with, and had sex with, Conley shortly before her death; he made incriminating statements to three people about having killed Ramseur. Defendant had a foreboding attitude toward women when he was smoking crack. These similarities supported the finding of a transactional connection for purposes of joinder, and, considering the

STATE v. CHAPMAN

[342 N.C. 330 (1995)]

evidence in the light most favorable to the State, they also supported the submission and finding of the course of conduct aggravating circumstance. *See State v. Gibbs*, 335 N.C. 1, 61, 436 S.E.2d 321, 355-56 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994).

**[8]** Further, nothing in the record supports defendant's contention that the jury's finding both aggravating circumstances and no mitigating circumstances is evidence of the jury's "strong emotional or passionate feeling . . . of prejudice toward the defendant" or "clear aversion toward the defendant." In *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 860 (1995), this Court rejected a similar argument, stating: "We cannot hold that because the jury did not find that the defendant's evidence had mitigating value . . . [,] the jury was acting under passion, prejudice, or any other arbitrary factor." *Id.* at 737, 448 S.E.2d at 820. Defendant's argument is meritless.

**[9]** Nor do we find that defendant's death sentence is disproportionate. Proportionality review is intended to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994). It is also intended to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to others in the pool, which we defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

Since 1 June 1977, the effective date of our capital punishment statute, this Court has found death sentences disproportionate in only seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312

N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In none of those cases was the defendant convicted of more than one murder. *State v. Conaway*, 339 N.C. 487, 541, 453 S.E.2d 824, 858 (1995). Indeed, the fact that defendant is a multiple killer is " 'a heavy factor against [him].' " *State v. McHone*, 334 N.C. 627, 648, 435 S.E.2d 296, 308 (1993) (quoting *State v. Robbins*, 319 N.C. 465, 529, 356 S.E.2d 279, 316, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987)), *cert. denied*, —— U.S. ——, 128 L. Ed. 2d 220 (1994). Defendant argues that the most damning evidence against him in the Ramseur murder was Creasman's hearsay testimony and that this Court should therefore not consider this to be a case of multiple homicide. The evidence belies this argument. In addition to Creasman's testimony, which we have found admissible because it possessed substantial guarantees of trustworthiness, defendant told at least three people that he killed Ramseur.

The aggravating circumstances the jury found in this case were also found in *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995), where this Court affirmed the defendant's death sentence even though the jury found three statutory and two nonstatutory mitigating circumstances. The Court noted that these two aggravators are found in many cases that result in death sentences. *Id.* at 63, 446 S.E.2d at 287. There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to sustain death sentences; these two are among them. *State v. Bacon*, 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8. None of the cases in which this Court has determined the death penalty to be disproportionate has included the (e)(3) aggravator. *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 752 (1995). In only two cases in which this Court has found the death penalty disproportionate did the jury find the (e)(11) aggravating circumstance: *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713, and *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170. In neither *Rogers* nor *Bondurant* did the course of conduct involve a second murder, as it did here. In summary, defendant's case is not comparable to any case in which this Court has held the death sentence disproportionate.

Several additional characteristics of this case support the determination that imposition of the death sentence was not disproportionate. The victims in this case were vulnerable, in that they were women who engaged in the high-risk lifestyle of regular drug use. *Cf.*

*State v. Moseley,* 336 N.C. 710, 729, 445 S.E.2d 906, 917 (1994) (female victim was alone and vulnerable), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 802 (1995). In addition, defendant appears to have no remorse for his conduct. *See State v. Robinson,* 336 N.C. 78, 137, 443 S.E.2d 306, 336 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 650 (1995). Finally, there is no discernible reason why defendant killed these two women; the murders appear to be "the product of pure meanness." *State v. Jones,* 339 N.C. 114, 171, 451 S.E.2d 826, 858 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 873 (1995).

Considering the foregoing, as well as the crime and defendant, we conclude that the death sentence was not excessive or disproportionate. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.

Justice WEBB dissenting.

I dissent from the majority opinion. I believe it was error to consolidate the two cases for trial. N.C.G.S. § 15A-926(a) says:

Two or more offenses may be joined . . . for trial when the offenses . . . are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan.

I do not believe the two crimes were based on a series of acts or transactions connected together or constituting parts of a single scheme or plan. The murders occurred two months apart. I can see nothing in the record that indicates that the defendant was scheming to kill another person at the time the first murder was committed. The fact that the two crimes had a common *modus operandi* does not show a continuing scheme or plan. I believe that without more of a showing of one scheme to murder two persons it was error to consolidate the cases for trial.

I vote to grant new trials on the two charges.