An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

NO. COA 15-176

Filed: 20 October 2015

Mecklenburg County, Nos. 11 CRS 246048-52, 244958, 244966, 244969-72

STATE OF NORTH CAROLINA,

v.

DAVEN LORENZO TEETER, Defendant.

Appeal by Defendant from judgment entered on 4 March 2014 by Judge Nathaniel J. Poovey in Mecklenburg County Superior Court. Heard in the Court of Appeals 27 August 2015.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Lynne Weaver, for the State.*
>
> *Wait Law, P.L.L.C., by John L. Wait, for Defendant-Appellant.*

HUNTER, JR, Robert N., Judge.

Daven Lorenzo Teeter ("Defendant") appeals from a jury verdict convicting him of four counts of first-degree kidnapping, two counts of robbery with a dangerous weapon, two counts of felonious breaking and entering, two counts of first-degree sexual offense, first-degree rape, and communicating threats. Defendant contends the trial court erred in denying Defendant's motion to dismiss one charge of first-degree kidnapping and in allowing the State's motion for joinder. We find no error.

## I. Factual and Procedural History

On 10 October 2011, the grand jury indicted Defendant for first-degree rape, first-degree sexual offense, two counts of first-degree kidnapping, robbery with a dangerous weapon, communicating threats, and felonious breaking and entering. On 24 October 2011, the grand jury indicted Defendant for two counts of first-degree kidnapping, robbery with a dangerous weapon, felonious breaking and entering, and attempted first-degree sexual offense. On 13 January 2014, the grand jury issued a superseding indictment for one charge of first-degree kidnapping to include Jane Romenski's[1] status as a minor. The grand jury also issued a superseding indictment to remove the serious injury component of the first-degree rape charge.

On 19 January 2012, the State filed a written motion to join all twelve charges. The trial court granted the motion to join all charges over Defendant's objection on 24 February 2014.

Defendant's jury trial began on 24 February 2014. Judge Nathanial J. Poovey presided over Defendant's trial in Mecklenburg County Superior Court. Defendant pled not guilty to all charges. The State's evidence, in part, tended to show the following.

Ana Romenski ("Romenski"), a widow originally from El Salvador, testified for the State. Romenski lives in Charlotte with her two children, Sam and Jane.

---

[1] This case involves two minors. We have changed their names to protect their identities.

Romenski testified about the events of 23 April 2010. At that time, Sam was 14 and Jane was 7.

> My son was getting ready for going to school. [I got] up early, make sure that the kids get ready for school. Between 6:00, 6:30 . . . At the time I was ready to warm my car, I see the guy approach me in the door with a knife. I was in my house. [I tried to leave] my front door. [He was] a slim guy . . . Like he is here. He was with a . . . Russian hat. Blue bandanna. Jogging, Nike, Vans shoes. I was wearing clothing, like Victoria Secret clothes and a robe. [He was carrying] a bread knife with a meat cut. Like a small knife. [When he entered my house,] he asked me for money. I said, I don't have money, sir.

At this time, Romenski's son, Sam, was in the bathroom getting ready for school and Jane was in the family room watching television. Sam finished getting ready and exited the bathroom into the kitchen.

> [Defendant] said, "Get down," to my son. On the floor. In the kitchen. I was looking for this man, what he doing. He stay there. He started looking through cabinets looking for money.
>
> Next, he get out my son. He started us through my master bedroom. He started asking for money, looking for the money with a knife. He tied up my son and put my son in my daughter's bedroom . . . I was in shock, you know, with the situation. I saw [Sam] was tied. He tied him really tight. He tied him in the kitchen. It started in the kitchen. With duct tape.
>
> He bring me to my bedroom. To the bedroom, he say to me go to the bed. Get in the bed. He said, get in the bed and he want to touch me over there. I said, "Why? I don't want to do that." I don't want to. So I started fighting with him for the knife. I was fighting with him, with his hands. He

cut me on my finger. He tied me up, and he put me in the
closet. My hands was with cable, and my legs with duct
tape . . . He told me to take my clothes off.

Romenski then described in graphic detail how Defendant forced her to engage in a

sexual act. She estimated the encounter lasted 20 to 30 minutes.

Then, Romenski described Defendant's search for money:

He used me, and then he grabbed me and started, you
know, looking for the money. He said, "Where is the
money?" He looking . . . I say to him, "It's in the safe." I
have a little safe in my closet, my bedroom. On the floor in
my closet in the bedroom. I give him the key. There was
money in there. Right around $2,000 . . . [and] my
husband's jewelry, like ring. He put it in his pants . . . . He
put me down, and then he started looking through my
cabinets . . . He opened all my cabinets in my bedroom and
started looking for money. I hear noise when he opened
one of the cabinets, then he shut the door and he get out.

Romenski explained how her son untied her and contacted the police:

. . . I saw my son come in. . . He was tied up. His mouth
was like that. His hands were tied, and he was jumping
like this. They taped his hands and his feet. He jumping.
He was on the bed in my daughter's room. He come out
from the bed and he started walking to me, looking for me.
He tried to help me, untie me. I helped him to get untied.
Then we got the phone. We cannot find the phone, my
house phone. My son find the phone and called the police.
I was screaming, crying. I was feeling terrible. . . . I think
[Defendant] took my [cell] phone.

About a year-and-a-half later, on the morning of 4 October 2011, Romenski was

getting her children ready for school again. Sam left for school. Romenski was about

to drive her daughter, Jane, to the bus stop when Defendant entered her garage.

Romenski described the morning of 4 October 2011 as follows.

> [H]e approached me with a knife. He was looking with the hat, the Russian hat. The same bandana. . . . At the time [my daughter] was with me. We didn't make it to get in [the car]. She was trying to get in the passenger's side, and I was getting toward the driver's side. He approached me with the knife. He approached us. He say — he take me from the neck and pushed me back. He say, where is the money. I said, "I don't have the money."
>
> He grabbed my daughter by the hand and he bring me inside the house. Again, he put me in the bedroom and put my daughter in the [master] bathroom, covered with a blanket. . . . He closed [the bathroom door]. . . . He started to ask for the money, where is the money at. . . . He took all my credit cards from my purse. . . . He take all the cards, dump it on the floor. He said, "Which card has money?" [I told him] the ATM card for the bank. He took the card.
>
> Before that, he abused me sexually. Like, you know, he rape me. He put me in the closet. He said, "Pull your clothes." I said, "I can't." I was tied.

Romenski explained Defendant "started getting crazy looking for the money." Defendant searched the safe, finding nothing, before he covered Romenski's face with a cloth. Defendant took Romenski and her daughter into the garage. Romenski explained: "He put me right away in the trunk. My little girl — he put her behind the [back seat of my] car . . . covered with a blanket. I [felt the car] moving."

When Defendant opened the trunk, Romenski was back at her house. Defendant returned because he lost Romenski's ATM card. Romenski felt "terrible"

from riding in the trunk. Hands and feet still bound, Romenski entered her home. Once inside, Defendant directed Romenski to the hallway bathroom where he cut her bindings. He forced Romenski to take a shower, directing her to "wash really good". Once Romenski was finished, she put her clothes back on. Romenski testified, "Right away he took me out the back again to the car with my daughter. He tied me again . . ."

Romenski gave Defendant her ATM pin number. Defendant again put Jane in the floorboard of the backseat. Romenski said, "I go in front with you. I am feeling terrible," to which Defendant replied, "No. Hell no . . . you get in the trunk." With Romenski tied in the trunk, Defendant went to Suntrust Bank and withdrew money from the ATM using Romenski's card.

Romenski tried to escape. She tried to use the trunk's emergency release, but Defendant caught her before she was able to escape. From the trunk, Romenski started yelling, "I need air." Defendant asked whether she could drive. Romenski used her chance to drive as her way to escape. She explained:

> He stopped the car and he . . . untied me with the knife. I was getting in my car. I was covered my face in the trunk. I was dizzy. . . . I get out. I said, "Why am I here?" I am looking everywhere. I feel like — I feel really terrible. I get out and get in my car. My daughter, she was in the car. Next he tried to coming back. I right away locked my button. He bang at the door with the glass. . . . I already secured it. It was locked. I get out and drive. . . . I was looking for somebody to help me.

Romenski drove to a public library. Romenski and her daughter went inside. Romenski recalled the moment she made it to the library:

> When I got out of the car, I was screaming. No shoes, crying, and getting in the library and asked these people, "Please help. I have been robbed." I was with my little girl. I was screaming. I was out of control. "Call the police," I said to these people. The lady from the library, she called the police.

Police arrived at the library. An officer took Romenski to the hospital. Romenski testified, "They make me, they make me [take a sexual assault] exam."

The State called a number of Charlotte-Mecklenburg police officers as witnesses. Following the first offenses on 23 April 2010, police found a small knife and duct tape in a nearby wooded area as well as a Russian-style hat, a jacket, and a pair of gloves in a nearby trashcan. In Romenski's yard, police discovered a set of keys and a zip-tie. Police took Romenski to a hospital where a rape kit was administered, but the DNA found did not match any person in their database.

Following the second robbery, police tracked Romenski's stolen cell phone. Using GPS technology, police determined the phone's location. Officers drove to a house at that location and knocked on the door. A woman, Audrey Pickard ("Pickard"), answered the door and gave police permission to enter. An officer dialed Romenski's cell phone number and heard a phone ring. Pickard gave officers permission to search the house. Officers entered a room off of the hallway, where they found a man sitting in the dark. Officers recognized the man from photos taken

by security cameras at SunTrust Bank. Officers arrested the man, later identified as Daven Teeter. Upon continuing their search, officers found duct tape, a knife, Romenski's ATM card, and a Russian-style hat inside a bedroom closet. DNA tests showed the Defendant's DNA matched DNA from both of Romenski's rape kits.

Defendant made a motion to dismiss at the close of the State's evidence. Defendant specified the motion to dismiss went to each individual charge and every element of every charge. The trial court denied Defendant's motion. At the close of all evidence, the defense renewed all motions to dismiss, which were again denied. A jury convicted Defendant of four counts of first-degree kidnapping, two counts of robbery with a dangerous weapon, two counts of felonious breaking and entering, two counts of first-degree sexual offense, first-degree rape, and communicating threats.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2014), which provides for an appeal of right to the Court of Appeals from any final judgment of a superior court.

## III. Analysis

### A. Motion to dismiss first-degree kidnapping charge

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.3d 29, 33 (2007). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial

evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

Both the United States Constitution and North Carolina Constitution protect defendants from being convicted and sentenced twice for the same offense. U.S. Const. amend. V, N.C. Const. art I, §19, *See State v. Gardner*, 315 N.C. 444, 450-451, 340 S.E.2d 701, 706 (1986). The United States Supreme Court applies the *Blockburger* test to analyze multiple offenses for double jeopardy purposes:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Gardner*, 315 N.C. at 454, 340 S.E.2d at 708–709 (quoting Bl*ockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182 (1932)). Protection against cumulative punishments restrains the sentencing power of the courts, not the power of the legislature. *Gardner*, 315 N.C. at 453, 340 S.E.2d at 708. The legislature holds the power to establish North Carolina's laws on crimes and punishments.

To apply the *Blockburger* test, we must first look to the two charges at issue in this case, kidnapping and robbery with a dangerous weapon. The North Carolina legislature outlines kidnapping as follows:

> Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent of legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:
> (1) Holding such other person for a ransom or as a hostage or using such other person as a shield; or
> *(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony*; or
> (3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person; or
> (4) Holding such other person in involuntary servitude in violation of G.S. 14-43.12.
> (5) Trafficking another person with the intent that the other person be held in involuntary servitude or sexual servitude in violation of G.S. 14-43.11.
> (6) Subjecting or maintaining such other person for sexual servitude in violation of G.S. 14-43.13.

N.C. Gen. Stat. §14-39(a) (2014) (emphasis added). The legislature requires the following to be convicted of robbery with a dangerous weapon, a Class D felony:

> Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, *whereby the life of a person is endangered or threatened*, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night, or who aids or abets any such person or persons in the commission of such crime, shall be guilty of a Class D felony.

N.C. Gen. Stat. §14-87 (2014) (emphasis added).

The kidnapping statute's language shows that a court may, at least in some instances, sentence a defendant for both kidnapping and a felony. "[T]here is no constitutional barrier to the conviction of a defendant for kidnapping, by restraining his victim, and also of another felony to facilitate which such restraint was committed, provided the restraint, which constitutes the kidnapping, is a separate, complete act, independent of and apart from the other felony." *State v. Fulcher*, 294 N.C. 503, 524, 243 S.E.2d 338, 352 (1978). The two crimes do not have to be substantially separate in time. *Id.*, 243 S.E.2d at 352.

The key question is "whether the kidnapping charge is supported by evidence from which a jury could reasonably find that the necessary restraint for kidnapping exposed the victim to greater danger than that inherent in the underlying felony itself." *State v. Muhammad*, 146 N.C. App. 292, 295, 552 S.E.2d 236, 237 (2001) (citing *State v. Beatty*, 347 N.C. 555, 559, 495 S.E.2d 367, 369 (1998)). Evidence that a defendant increased the victim's helplessness and vulnerability "beyond what was

necessary to enable the robbery," exposes the victim to greater danger and thus is sufficient to support a kidnapping charge. *Id.*, 495 S.E.2d at 369.

The Supreme Court of North Carolina has differentiated between restraining the victim solely with the weapon used in the commission of the robbery and physically restraining the victim with tape or rope. Forcing the victim to walk to another location at knifepoint to rob a cash register was not sufficient to support a separate kidnapping conviction. *State v. Irwin*, 304 N.C. 93, 103, 282 S.E.2d 439, 446 (1981). "[T]he restraint necessary and inherent to the armed robbery was exercised by threatening the victim with the [weapon]. When defendant bound the victim's hands and feet, he exposed the victim to a greater danger than that inherent in the armed robbery itself." *State v. Pigott*, 331 N.C. 199, 210, 415 S.E.2d 555, 561 (1992) (internal quotations omitted). Binding a victim's wrists with duct tape, forcing him to lie on the floor, and kicking in the back twice are not inherent parts of a robbery. *State v. Beatty*, 347 N.C. 555, 559, 495 S.E.2d 367, 370 (1998). These actions exposed the victim to greater harm than inherent in the robbery. *Id.*

Defendant appeals from the motion to dismiss the kidnapping charge pertaining to Romenski on 23 April 2010. He does not dispute the other kidnapping charges. Defendant argues that the restraints used on Romenski were used to commit the robbery. Def.'s Br. 10–11. Defendant argues that the "kidnapping here was necessary and integral to completing the robbery." Def.'s Br. 11. Defendant was

subject to double jeopardy because "the facts underlying the alleged kidnapping in this case were necessary to complete the robbery." Def.'s Br. 11. We are not persuaded.

These facts crossed the threshold from acts necessary to complete the robbery into acts above and beyond that which constitute a kidnapping. As explained in *Pigott*, the restraint necessary for the robbery was exercised by threatening Romenski with a weapon, here a knife. Similar to *Beatty*, when Defendant bound Romenski Defendant used restraint unnecessary for commission of the robbery. Romenski described how Defendant, "…tied me up, and he put me in the closet. My hands was with cable, and my legs with duct tape." The extra restraints increased Romenski's helplessness and vulnerability beyond what would be expected in an armed robbery. As a result, she was exposed to greater danger. The kidnapping charge is supported by the restraints used above and beyond what was necessary for the armed robbery conviction. The trial court properly denied Defendant's motion to dismiss one charge of first-degree kidnapping.

## B. Motion for Joinder

"Two or more offenses may be joined in one pleading or for trial when the offenses, whether felonies or misdemeanors or both, are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan." N.C. Gen. Stat. §15A-926 (a) (2014). It is within

the trial court's discretion to determine whether cases with a transactional connection should be consolidated for trial. *State v. Chapman*, 342 N.C. 330, 342–343, 464 S.E.2d 661, 668 (1995). The trial judge's decision to join or not join transactionally connected cases will not be disturbed absent an abuse of discretion. *State v. Greene*, 294 N.C. 418, 421–422, 294 S.E.2d 662, 664 (1978). However, whether offenses are transactionally related is a question of law reviewable *de novo* on appeal. *Chapman*, 342 N.C. at 342–343, 464 S.E.2d at 668.

In order for charges to be joined, there must be a "transactional connection" common to all of the charges. *State v. Williams*, 308 N.C 339, 343, 302 S.E.2d 441, 445 (1983) (citing *State v. Silva*, 304 N.C. 122, 126, 282 S.E.2d 449, 452 (1981)). The nature of the offenses is one factor that may be considered by the trial court in determining whether the criminal acts were part of a common scheme or plan. *State v. Greene*, 249 N.C. 418, 422, 241 S.E.2d 662, 665 (1978).

The Supreme Court of North Carolina's decision in *Williams* is instructive. In that case, the defendant broke into victim's home on two separate occasions approximately one month apart. *Williams*, 308 N.C. at 340–341, 302 S.E.2d 441, 443–444. On both occasions, the same defendant entered the same home through a window and raped the same woman. *Id.*, 302 S.E.2d at 443–444. The Supreme Court of North Carolina found an "obvious 'transactional connection'" between the two offenses, though they were separate in time. *Id.* at 344, 302 S.E.2d at 445.

We note that even if the motion to join had been denied, it is likely testimony about the other encounter between Defendant and Romenski would have been admitted into evidence. Under Rule of Evidence 404(b), "evidence of the defendant's prior sex offenses [may be] offered for the proper purpose of showing plan, scheme, system, or design." *State v. Simpson*, 187 N.C. App. 424, 430, 653 S.E.3d 249, 252 (2007) (quoting *State v. Curry*, 153 N.C. App. 260, 264, 569 S.E.2d 691, 694 (2002)). "Similarities need not be bizarre or uncanny; they simply must 'tend to support a reasonable inference that the same person committed both the earlier and later acts.'" *State v. Murillo*, 349 N.C. 573, 593, 509 S.E.2d 752, 764 (1998) (quoting *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991)).

On appeal, Defendant contends the crimes committed on separate dates could not be joined for trial. Def.'s Br. 12–13. Although Defendant acknowledges the two incidents were similar, Defendant argues the "similarities did not outweigh the potential prejudice to [Defendant]." Def.'s Br. 13. The second incident included "harsher facts" that make it sufficiently different from the first incident to warrant a different trial. Def.'s Br. 14. Defendant specifically points to the rape charge and putting Romenski in the trunk of her car. Def.'s Br. 13–14. We disagree.

This case is similar to *Williams* because it involves the same Defendant committing similar crimes against the same person on different days. Although separated by time, both sets of events involved the same Defendant, same victim, and

the same type of offenses. The Defendant entered the house both times holding a knife early in the morning as Romenski was getting her children ready for school. Both times he demanded money. As Romenski testified, Defendant wore the same Russian hat and blue bandana on both mornings. The Defendant bound Romenski and put her in her closet before he sexually assaulted her the first time and before he raped her the second time. Romenski's description of both sexual encounters showed they followed a pattern. Describing the first sexual offense, she testified, "He tied me up and put me in the closet. My hands was with cable, and my legs with duct tape . . . He told me to take my clothes off. Then he opened my legs . . ." Describing the rape, she testified, "He put me in the closet. He said, "Pull your clothes." I said, "I can't." I was tied." Although some facts and charges are not identical, they have met the requirement of a "transactional connection" to allow the trial court to determine, within its discretion, whether to join the charges.

## IV. Conclusion

For the foregoing reasons, the orders of the trial court denying Defendant's motion to dismiss and allowing the State's motion for joinder were not in error and the judgment of the trial court is affirmed.

NO ERROR.

Judges Dillon and Dietz concur.

Report per Rule 30(e).